**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

REIS, INC. and REIS SERVICES, LLC,

                         Plaintiffs,

           - against -

LENNAR CORP., RIALTO CAPITAL MANAGEMENT, LLC, and RIALTO CAPITAL ADVISORS OF NEW YORK, LLC,

                         Defendants.

___ Civ. _____ (      )

**COMPLAINT**

**JURY TRIAL DEMANDED**

       Plaintiffs Reis, Inc. and Reis Services, LLC (collectively, "Reis") allege the following based upon personal knowledge as to their own actions and upon information and belief as to all other matters:

<u>**Nature of the Action**</u>

       1.     This is an action for data piracy brought under the Computer Fraud and Abuse Act, 18 U.S.C. § 1030 *et seq.* and the Copyright Act, 17 U.S.C. § 101 *et seq.* Defendants Lennar Corporation ("Lennar") and Rialto Capital Management, LLC ("Rialto") used misappropriated login credentials to access Reis's proprietary subscription database without authorization and to download—without paying—4,548 commercial analytic reports having a retail value of at least $1,629,948. Separately, Defendant Rialto Capital Advisors of New York, LLC ("Rialto New York")—an affiliate of Lennar and Rialto that began subscribing to Reis shortly after their illegal usage stopped—has unlawfully shared its access with unknown unauthorized users (the "Doe Unauthorized Users"), who have downloaded reports worth an additional $277,412. In total, Defendants have stolen or helped steal $1,907,360 worth of Reis reports.

2.      Reis's proprietary database (the "Reis Database") has been developed and maintained by Reis through extraordinary investment, effort, and creativity over the last 34 years.  Reis, Inc. is a public company that is a leader in providing up-to-date commercial real estate market information and analysis.  The Reis Database contains detailed information on commercial properties in 275 of the largest metropolitan markets and over 7,000 discrete neighborhoods throughout the United States.

3.      Because the Reis Database is of great value to those working in the field of commercial real estate, it has unfortunately become a target for data pirates and others wishing to benefit from Reis's services without paying for them.  To combat this piracy, Reis's Compliance Group diligently investigates unusual patterns of use and other signs of possible theft of the data from the Reis Database.  Reis's Compliance Group discovered the unauthorized usage that forms the basis of Reis's claims against Lennar and Rialto in June 2015.

4.      In October 2009, Harvey Lederman (the "Rialto Employee") joined Rialto.  Mr. Lederman had been issued Reis credentials by a previous employer that subscribed to Reis. Reis's contract with that subscriber and its Terms of Service prohibit the use of credentials issued to one subscriber from being used for the benefit of another subscriber.  Ignoring this prohibition, Mr. Lederman used Reis credentials from his previous employer—a completely separate publicly traded company—to support Rialto and Lennar's business.  Between December 2009 and October 2010, Mr. Lederman used his unauthorized access to the Reis Database to download thousands of Reis reports having a retail value of $1,629,948.

5.      In November 2010, about one month after the Rialto Employee's illegal usage stopped and around the same time Rialto completed its first closing, Rialto Capital Advisors of New York, LLC ("Rialto New York"), a subsidiary of Rialto, began subscribing to the Reis

2

Database.  Before November 2010, no Lennar or Rialto affiliate was licensed to use the Reis Database.

6.    As a result of Reis's discovery in June 2015 of Lennar and Rialto's unauthorized usage, Reis has begun to investigate more closely the usage associated with Rialto New York's credentials.  Reis's investigation has uncovered usage of Rialto New York credentials from two Internet Protocol ("IP") addresses—67.136.101.2 and 173.11.106.97—that cannot be traced back to Rialto New York.

7.    Rialto New York shared valid credentials issued under its Reis subscription agreement with the Doe Unauthorized Users, in violation of its contract with Reis as well as Reis's Terms of Service.  Between May 2013 and August 2015, the Doe Unauthorized Users have used these Reis credentials to download at least 747 proprietary Reis reports having a retail value of $277,412.  These reports include copyrighted works in which Reis has registered its copyright.  In addition to its other claims, Reis is suing Rialto New York for contributory and vicarious infringement of these copyrighted works.

### Parties

8.    Plaintiff Reis, Inc. is a Maryland corporation with its principal place of business in New York, New York.  Reis provides commercial real estate market information and analytical tools to real estate professionals through its subsidiary, plaintiff Reis Services, LLC.

9.    Plaintiff Reis Services, LLC is a limited liability company that is wholly owned by Reis, Inc.

10.    Defendant Lennar Corporation is a Delaware corporation with its principal place of business in Florida.

11.     Upon information and belief, Defendant Rialto Capital Management, LLC is a limited liability company whose sole member is Defendant Lennar Corporation, a citizen of Delaware and Florida.

12.     Upon information and belief, Defendant Rialto Capital Advisors of New York LLC is a limited liability company whose sole member is Rialto Capital Advisors, LLC, a limited liability company whose members are Defendant Lennar Corporation and Defendant Rialto Capital Management, LLC.

## Jurisdiction and Venue

13.     This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. §§ 1331, 1332 and 1367.

14.     Venue is proper in this Court pursuant to 28 U.S.C. § 1391(b).

## Facts

**Reis's Business and the Reis Database**

15.     Reis (including its predecessors) was founded in 1980 and is recognized by the real estate industry and the business and trade press as one of the premier sources of objective, timely, and granular market information.  This reputation was built by hard work and investment. Significantly, Reis's work is particularly valued because of its objectivity; Reis is independent of property owners and developers and does not compete as a broker in the listings space.

16.     The Reis Database contains information on apartment, office, retail, warehouse/distribution, flex/research and development, self-storage, and seniors housing properties, and is used by real estate investors, lenders, and other professionals to make informed buying, selling, and financing decisions.  In addition, Reis data is used by debt and equity investors to assess, quantify, and manage risks of default and loss associated with individual

4

mortgages, properties, portfolios, and real-estate-backed securities.  Reis's products are designed to meet the demand for timely and accurate information to support the decision-making of its customers.

17.    To maintain its position as a market leader, Reis continually invests in the databases, technologies, intellectual capital, and personnel (including over 200 employees) critical to supporting the ever-increasing information needs of commercial real estate professionals.  Without access to the proprietary information developed and maintained by Reis, it would be incredibly burdensome, expensive and time consuming for a licensee (or other interested professional) to obtain equivalent in-depth information.  Most professional real estate investors do not want to devote the resources to creating an in-house infrastructure capable of performing this work, which is why they subscribe to Reis's services.

18.    Reis offers a variety of product delivery services that cater to the needs of different types of users.  They include *Reis SE*, Reis's flagship delivery platform aimed at larger and mid-sized enterprises; *ReisReports*, aimed at other professional customers and smaller enterprises; and *Mobiuss Portfolio CRE*, or *Mobiuss*, aimed primarily at risk managers and credit administrators at banks and non-bank lending institutions.  It is through these products that Reis provides online access to the Reis Database.

19.    In addition, Reis continues to develop and introduce new products, expand and add markets and data, and find new ways to deliver existing information to meet client demand. The depth and breadth of Reis's data and expertise are critical in allowing Reis to grow its business.  To maintain its position, Reis continuously expends substantial additional investments and efforts to maintain and improve its offerings and ensure their currency.

**Subscriptions to the Reis Database**

20.     Reis offers users a choice between pay-as-you-go access to the Reis Database and subscription-based access.  Both involve fee-based access pursuant to a license agreement with Reis.  Data from the Reis Database is made available in six ways, with price points that reflect the level of content being purchased:

- annual and multi-year subscriptions to *Reis SE* ranging in price from $1,000 to over $1,000,000, depending on the subscriber's line of business, the number of subscriber employees licensed to use the service, the anticipated frequency of access and the combination of markets, property types, and reports subscribed to, for which the subscriber is typically allowed to download an unlimited number of reports over the subscription period in return for the up-front commitment to a fixed annual fee;

- annual and multi-year subscriptions to *Mobiuss* typically ranging in price from the low tens of thousands of dollars into the hundreds of thousands of dollars;

- capped *Reis SE* subscriptions ranging in price from $1,000 to $25,000, allowing clients to download content up to a ceiling defined by the contractually agreed maximum retail value of reports over a particular period of up to twelve months;

- subscriptions to *ReisReports*, which are charged to a credit card, having a retail price ranging up to $150 per month, with monthly or annual pricing options available;

- custom data deliverables ranging in price from $1,000 for a specific data element to hundreds of thousands of dollars for custom portfolio valuation and credit analysis; and

6

- individual reports, which can be purchased with a credit card, having retail prices up to $999 per report and are available to anyone who visits Reis's retail website or contacts Reis by telephone, fax or e-mail. Certain reports, however, are available only with an annual subscription or capped subscription account.

21.    Reis provides its information services to many of the nation's leading lending institutions, equity investors, brokers, and appraisers, all of which pay fees of up to several hundred thousand dollars per year in order to use the Reis Database.

22.    As of June 30, 2015, Reis had 988 enterprise subscribers under signed contracts for its core *Reis SE* product. A subscribing entity may have one or many users entitled to access *Reis SE*. The number of users is a negotiated term of the contract, with higher prices generally charged to those subscribers who want more of their employees to have access. In addition to these enterprise subscribers, there are other users who pay for individual reports by credit card, subscribers to the *ReisReports* product, and additional users of information available on third party platforms through Reis's data redistribution relationships.

23.    The vast majority of Reis's subscribers have utilized its core product for many years.

**Reis's Registered Copyrights**

24.    Reis has registered with the United States Copyright Office its copyrights in the Reis reports on which the copyright infringement claims in this action are based. Each of the following reports has been registered with the Copyright Office under the Registration Certificates indicated below (each such report, a "Copyrighted Work"):

7

8200817

| Report Name | Registration number |
|---|---|
| United States Metro Executive Briefings Apartment – 2nd Quarter 2015 | TX 8-070-665 |
| United States Metro Executive Briefings Office – 2nd Quarter 2015 | TX 8-070-662 |
| United States Metro Executive Briefing Apartment – 1st Quarter 2015 | TX 8-041-576 |
| United States Metro Executive Briefings Office – 1st Quarter 2015 | TX 8-041-373 |
| United States Metro Executive Briefings Retail – 1st Quarter 2015 | TX 8-041-562 |
| United States Metro Executive Briefings Apartment – 4th Quarter 2014 | TX 7-988-627 |
| United States Metro Executive Briefings Office – 4th Quarter 2014 | TX 7-988-652 |
| United States Submarket Executive Briefings Retail – 4th Quarter 2014 | TX 7-988-636 |
| About Reis | TX 7-972-959 |

True copies of these Copyright Registration Certificates are annexed to this Complaint as Exhibit A.

**Access to the Reis Database**

25.    The Reis Database is protected by a firewall.  Access to the Reis Database is by secure password and can be customized to accommodate the coverage, property type, and analytical needs of subscribers, providing access only to those portions of the database that the subscriber has paid to see.  To protect its proprietary rights, Reis also relies on, among other things, restrictive license agreements with subscribers.

26.    When a company enters into a license agreement with Reis, it may obtain licenses for an agreed number of employees or other users associated with the company.  Each individual user is then issued his or her own login credentials consisting of a unique username and password to access the Reis Database.

27.    Users are not allowed to share passwords with colleagues who work for a subscriber, much less with third parties.  Nor may they take them to a new employer if they cease

to work for the subscriber. Reis's Terms of Service, found on its website at
https://www.reis.com/terms-of-service, and attached in substantially similar form to its
subscriber agreements—including its agreements with Rialto New York and with the Rialto
Employee's previous employer—explicitly prohibits its licensees to "resell or transfer . . . use of
or access to" the Reis Database and elsewhere states that "[t]ransfer or assignment of your
password and user name to another individual is strictly prohibited."

28.     All users of the Reis Database, whether subscribers or first-time consumers, agree
to be bound by the "terms, conditions, and notices contained" in the Terms of Service, and use of
the Reis Database indicates acceptance of the Terms of Service. Among other things, the terms
require payment of fees for use of the Reis Database and obligate users to refrain from acting "in
such a manner" so as to cause Reis the "loss of a potential sale or subscription."

29.     Reis also maintains an Anti-piracy Policy on its website at
https://www.reis.com/anti-piracy-policy, which policy defines "piracy" as "using our service
without a license to do so, enabling or trying to enable a third party who is not authorized to use
our service to use our service, or exceeding the scope of the uses permitted you under a license
agreement between you and Reis."

30.     Links to Reis's Terms of Service and Anti-piracy Policy are clearly labeled on the
sign-in page of the Reis Database under the heading "LEGAL," which is prominently displayed
one inch below the sign-in fields. These links put users on notice that their access and use of the
Reis Database are subject to the Terms of Service. A screen shot of the login page is provided
here:

9



**Lennar and Rialto's Unauthorized Use of the Reis Database and Rialto New York's Unauthorized Sharing of Reis Credentials**

31.     Reis's Compliance Group recently uncovered the Rialto Employee's usage of credentials from an unrelated previous employer.  The Rialto Employee used these credentials between December 2009 and October 2010 in support of Rialto's launch.  Reis did not know until June 2015, however, that the Rialto Employee had stopped working for his previous employer in 2003.

32.     Over a six-year period between 2003 and the Rialto Employee's coming to Rialto in October 2009, these credentials were used a total of 92 times.  Between December 2009 and October 2010, these credentials were used a total of 871 times.  During this timeframe, the Rialto Employee's credentials were used to download 4,548 Reis reports with a retail value of $1,629,948, in support of Lennar and Rialto's business.

10

33.     In recent years, Reis's Compliance Group has begun to uncover widespread unauthorized usage of the Reis Database and has increased its efforts to identify patterns of such unauthorized use.  In 2015, investigation of these patterns uncovered the unauthorized activity using the Rialto Employee's credentials between December 2010 and October 2009.

34.     During this timeframe, Lennar was in the process of launching Rialto.  Lennar is a publicly traded company and on January 11, 2011, it announced its 2010 fourth quarter and fiscal year results to its shareholders.  In its press release, Lennar touted the "first closing of our Rialto real estate investment fund with initial equity commitments of approximately $300 million (including $75 million committed by us)."

35.     In November 2010, one month after Lennar and Rialto stopped using the Rialto Employee's unauthorized Reis credentials, Rialto New York purchased a Reis subscription. Before November 2010, no Lennar or Rialto affiliate was licensed to use the Reis Database.

36.     Based on Reis's discovery of Lennar and Rialto's unauthorized usage in 2009 and 2010, Reis's Compliance Group's began to further investigate Rialto New York's usage of the Reis database.  These  investigations have uncovered that, between May 2013 and August 2015, unidentified persons associated with IP addresses 67.136.101.2 and 173.11.106.97—which on information and belief are not associated with any Defendant—have been using Reis credentials issued to Rialto New York to download at least 747 of Reis's proprietary and copyrighted reports with a retail value of $277,412.

37.     Rialto New York's subscriber agreement with Reis and Reis's Terms of Service strictly prohibit the sharing of Reis login credentials or reports.

38.     Upon information and belief, Defendants' unauthorized intrusions into the Reis Database and unauthorized sharing of otherwise valid Reis credentials were knowing and willful,

11

8200817

because Defendants and their employees knew that Lennar and Rialto were not authorized licensees of Reis (and indeed, were logging in using the e-mail credentials of a completely separate publicly traded entity); knew that Lennar and Rialto had not paid for access to the Reis Database; knew that the unidentified users with whom Rialto New York shared its credentials were not authorized licensees of Reis and knew from their dealings with Reis, from Rialto New York's contract with Reis, and from the Terms of Service posted on the Reis Database website that login credentials are not transferable.

39.    Defendants' unlawful activities have damaged Reis, including by: (a) preventing Reis from collecting its customary charges for its proprietary data and information services; (b) preventing Reis from fully exploiting its licensing opportunities; and (c) causing Reis to devote time, money, and valuable resources to maintain the security of its database for licensees and paying customers.

40.    Reis has suffered damages as a result of Defendants Lennar and Rialto's unauthorized access and Defendant Rialto New York's unauthorized sharing of Reis credentials.

### Count I
### (Violation of Computer Fraud and Abuse Act, 18 U.S.C. § 1030)

41.    Reis repeats and incorporates the allegations of Paragraphs 1 through 40 of this Complaint as if set forth here.

42.    The Reis Database consists of servers and computers that are used in interstate commerce and comprise a "protected computer" as that term is used in 18 U.S.C. § 1030(e)(2)(B).

43.    Reis has maintained and secured the Reis Database by reasonable means at all relevant times.

12

8200817

44.     Defendants Lennar and Rialto intentionally accessed Reis's protected computer without authorization and thereby obtained proprietary data and information services from the Reis Database. *See* 18 U.S.C. § 1030(a)(2)(C).

45.     Defendants Lennar and Rialto knowingly and with intent to defraud accessed Reis's protected computer without authorization and by means of that conduct furthered the intended fraud and obtained proprietary data and information services from the Reis Database with a retail value of $1,629,948. *See* 18 U.S.C. § 1030(a)(4).

46.     Defendants Lennar and Rialto intentionally accessed Reis's protected computers without authorization and, as a result, caused a loss to Reis.

47.     As a result of Defendants' conduct, Reis has suffered loss in attempting to protect its rights against unauthorized access, downloading, and use of data and information stored in the Reis Database and in expending time, money, and resources (aggregating at least $5,000 in value) to conduct an investigation into the intrusion and a damages assessment.

48.     Determining the identity of a suspicious user is an essential part of Reis's damage assessment because the only way to determine whether a loss has occurred is to identify the user and determine whether it is acting pursuant to a duly issued license either by way of a Reis Subscriber Agreement or as a registered user paying for reports as they are accessed and downloaded from Reis.com.

49.     As part of the on-going investigation of Defendants' access and use of the Reis Database, Reis developed its own proprietary investigatory software at a cost of $76,364 in hourly wages of Reis developers from June 2014 through May 2015.

50.     The development of this software included many enhancements and fixes as Reis continued to investigate intrusions into its computer system by the Defendants and others.  This

process was necessary to keep up with the methods of persons like the Defendants which seek to mask use of the Reis Database from Reis's view by accessing the Reis Database from various IP addresses not readily traceable to the authorized users.

51.    Had the Reis developers not been working on this proprietary investigatory software tool, they would have been working to enhance and improve the Reis Database and the services provided to Reis clients.

52.    The role of this software is to investigate and identify suspicious patterns of usage of Reis's computers.  When such patterns are found, they are further investigated by persons in the Reis Compliance Group at a substantial cost to Reis to determine whether the usage is licensed or not.

53.    This software has been used to investigate unauthorized intrusions into the Reis Database, including by Defendants Lennar and Rialto.

54.    In addition, Reis's Vice President of Product Development and Intellectual Property spent on average $4,900 per month of time in 2014 and 2015 using this investigatory software tool to identify piracy.  The value of the Reis employees' time in investigating the Defendants' access and use of Reis's computer system exceeded $5,000 in one calendar year.

55.    Reis has also suffered economic damages in the amount of the lost retail value of the reports taken by the Defendant without a license in an amount to be determined at trial, but which is in excess of $1,629,948.

56.    As a result of Defendant's conduct, Reis has also suffered damage to its business and goodwill.

57.    Reis is therefore entitled to compensatory damages under the CFAA.

## Count II
### (Conspiracy to Violate the Computer Fraud and Abuse Act, 18 U.S.C. § 1030)

58.    Reis repeats and incorporates the allegations of Paragraphs 1 through 57 of this Complaint as if set forth here.

59.    The Reis Database consists of servers and computers that are used in interstate commerce and comprise a "protected computer" as that term is used in 18 U.S.C. § 1030(e)(2)(B).

60.    Reis has maintained and secured the Reis Database by reasonable means at all relevant times.

61.    The Doe Unauthorized Users intentionally accessed Reis's protected computer without authorization and thereby obtained proprietary data and information services from the Reis Database. *See* 18 U.S.C. § 1030(a)(2)(C).

62.    The Doe Unauthorized Users knowingly and with intent to defraud accessed Reis's protected computer without authorization and by means of that conduct furthered the intended fraud and obtained proprietary data and information services from the Reis Database with a retail value of $277,412. *See* 18 U.S.C. § 1030(a)(4).

63.    The Doe Unauthorized Users intentionally accessed Reis's protected computers without authorization and, as a result, caused a loss to Reis.

64.    Defendant Rialto New York conspired with the Doe Unauthorized Users to effect this unauthorized access, in violation of 18 U.S.C. § 1030(b).  Rialto New York took concerted action with the Doe Unauthorized Users to participate in a series of unlawful acts.  Rialto New York performed one or more overt acts pursuant to and in furtherance of the common scheme.

65.    As a result of this conspiracy, Reis has suffered loss in attempting to protect its rights against unauthorized access, downloading, and use of data and information stored in the

15

8200817

Reis Database and in expending time, money, and resources (aggregating at least $5,000 in value) to conduct an investigation into the intrusion and a damages assessment.

66.     Determining the identity of a suspicious user is an essential part of Reis's damage assessment because the only way to determine whether a loss has occurred is to identify the user and determine whether it is acting pursuant to a duly issued license either by way of a Reis Subscriber Agreement or as a registered user paying for reports as they are accessed and downloaded from Reis.com.

67.     As part of the on-going investigation of Defendants' access and use of the Reis Database, Reis developed its own proprietary investigatory software at a cost of $76,364 in hourly wages of Reis developers from June 2014 through May 2015.

68.     The development of this software included many enhancements and fixes as Reis continued to investigate intrusions into its computer system by the Doe Unauthorized Users and others.  This process was necessary to keep up with the methods of persons like the Doe Unauthorized Users which seek to mask use of the Reis Database from Reis's view by accessing the Reis Database from various IP addresses not readily traceable to the authorized users.

69.     Had the Reis developers not been working on this proprietary investigatory software tool, they would have been working to enhance and improve the Reis Database and the services provided to Reis clients.

70.     The role of this software is to investigate and identify suspicious patterns of usage of Reis's computers.  When such patterns are found, they are further investigated by persons in the Reis Compliance Group at a substantial cost to Reis to determine whether the usage is licensed or not.

16

71.     This software has been used to investigate unauthorized intrusions into the Reis Database, including by the Doe Unauthorized Users.

72.     In addition, Reis's Vice President of Product Development and Intellectual Property spent on average $4,900 per month of time in 2014 and 2015 using this investigatory software tool to identify piracy.  The value of the Reis employees' time in investigating the Doe Unauthorized Users' access and use of Reis's computer system exceeded $5,000 in one calendar year.

73.     Reis has also suffered economic damages in the amount of the lost retail value of the reports taken by the Doe Unauthorized Users without a license in an amount to be determined at trial, but which is in excess of $277,412.

74.     As a result of Rialto New York's conspiracy with the Doe Unauthorized Users, Reis has also suffered damage to its business and goodwill.

75.     Reis is therefore entitled to compensatory damages under the CFAA.

## Count III
### (Contributory Copyright Infringement)

76.     Reis repeats and realleges the allegations of Paragraphs 1 through 75 as if set forth here.

77.     At all relevant times, Rialto New York was aware that the Doe Unauthorized Users were viewing, copying, reproducing, displaying, distributing, and transmitting the Copyrighted Works.

78.     Rialto New York provided the Doe Unauthorized Users with Reis credentials, knowing that the Doe Unauthorized Users would use those credentials to commit these infringing activities.  In doing so, Rialto New York induced, caused or materially contributed to the Doe Unauthorized Users' infringing conduct.

17

8200817

79.    Rialto New York could have prevented this unauthorized use at any time by, among other things, changing their Reis passwords or informing Reis of the unauthorized usage.

80.    On information and belief, Rialto New York directly profited from the infringement of these Copyrighted Works.

81.    Upon information and belief, the foregoing actions of Rialto New York in violation of Reis's rights have been willful and intentional, executed with full knowledge of Reis's exclusive rights in the Copyrighted Works, and in conscious disregard of those rights.

82.    As a result of Rialto New York's contributory infringement of Reis's copyrights in the Copyrighted Works, Reis is entitled to maximum statutory damages, pursuant to 17 U.S.C. § 504(c), in the amount of one hundred fifty thousand dollars ($150,000) with respect to each work infringed, or such other amounts as may be proper under 17 U.S.C. § 504(c). Alternatively, at Reis's election, pursuant to 17 U.S.C. § 504(b), Plaintiffs shall be entitled to their actual damages, including recapture of Rialto New York and the Doe Unauthorized Users' profits from infringement, as will be proven at trial.

83.    Reis is further entitled to their full costs, including reasonable attorneys' fees, pursuant to 17 U.S.C. § 505, as well as pre- and post-judgment interest.

## Count IV
### (Vicarious Copyright Infringement)

84.    Reis repeats and incorporates the allegations of Paragraphs 1 through 83 of this Complaint as if set forth here.

85.    At all relevant times, Rialto New York was aware that the Doe Unauthorized Users were viewing, copying, reproducing, displaying, distributing, and transmitting the Copyrighted Works.

8200817

86.     Rialto New York had the right and ability to change its passwords, thereby preventing the infringing conduct.

87.     On information and belief, Rialto New York directly profited from the infringement of these Copyrighted Works.

88.     On information and belief, the foregoing actions of Rialto New York in violation of Reis's rights have been willful and intentional, executed with full knowledge of Reis's exclusive rights in the Copyrighted Works, and in conscious disregard of those rights.

89.     As a result of Rialto New York's vicarious infringement of Reis's copyrights in the Copyrighted Works, Reis is entitled to maximum statutory damages, pursuant to 17 U.S.C. § 504(c), in the amount of one hundred fifty thousand dollars ($150,000) with respect to each work infringed, or such other amounts as may be proper under 17 U.S.C. § 504(c).  Alternatively, at Reis's election, pursuant to 17 U.S.C. § 504(b), Plaintiffs shall be entitled to their actual damages, including recapture of Rialto New York and the Doe Unauthorized Users' profits from infringement, as will be proven at trial.

90.      Reis is further entitled to their full costs, including reasonable attorneys' fees, pursuant to 17 U.S.C. § 505, as well as pre- and post-judgment interest.

## Count V
### (Common Law Fraud)

91.     Reis repeats and incorporates the allegations of Paragraphs 1 through 90 of this Complaint as if set forth here.

92.     Defendants Lennar and Rialto intentionally misrepresented their identities each time they used the Rialto Employee's credentials from his previous employer—a publicly traded company wholly unrelated to Lennar and Rialto—to access the Reis Database.

93.     Each time Lennar and Rialto, or an individual acting for them, logged onto the Reis Database, they represented that they were the Rialto Employee and using the Reis Database for the benefit of the Rialto Employee's previous employer.  That representation was false each time it was made, and the user making it knew it was false each time it was made, not least because entering the Rialto Employee's credentials required entering the Rialto Employee's work e-mail address from his previous employer.

94.     Reis was damaged by Lennar and Rialto's fraudulent use of the Rialto Employee's credentials in an amount to be determined at trial, but not less than $1,629,948, exclusive of attorney's fees, costs, interest, and punitive damages.

## Count VI
### (Breach of Contract)

95.     Reis repeats and incorporates the allegations of Paragraphs 1 through 94 of this Complaint as if set forth here.

96.     Use of the Reis Database is governed by and subject to the Terms of Service located on the sign-in page of the Reis Database.

97.     At all relevant times, Reis prominently displayed a link to the Terms of Service on the sign-in page of the Reis Database.

98.     The Terms of Service is a valid, enforceable contract through which Reis provides authorized users with a limited license to use the Reis Database.  By entering into this contract, users agreed to pay fees associated with use of the Reis Database—either on a per-item basis or pursuant to a prearranged subscription agreement.

99.     By entering into this contract, Defendants Lennar and Rialto purposefully availed themselves of the privilege of conducting business in New York.

8200817

100.    Defendants Lennar and Rialto materially breached the Terms of Service by repeatedly accessing and downloading documents from the Reis Database without compensating Reis for this privilege and with knowledge of the Terms of Service.

101.    The Terms of Service are also incorporated into the subscriber agreement that governs Rialto New York's Reis subscription.  Defendant Rialto New York materially breached the Terms of Service and its subscriber agreement with Reis by sharing its login credentials with the Doe Unauthorized Users.

102.    As a direct and proximate result of Defendants' material breaches of the Terms of Service and the Rialto New York subscriber agreement, Reis has been harmed and is entitled to monetary damages in an amount to be determined at trial, but at least $1,907,360, exclusive of attorney's fees, costs, interest, and punitive damages.

### Count VII
**(Conversion and Theft)**

103.    Reis repeats and incorporates the allegations of Paragraphs 1 through 102 of this Complaint as if set forth here.

104.    Defendants Lennar and Rialto downloaded 4,548 reports from the Reis Database without paying for them.

105.    Defendants Lennar and Rialto have exercised control and ownership over each downloaded report, to the exclusion of Plaintiffs.

106.    As a result, Reis suffered damage in the form of a lost sale for each report taken by Defendants Lennar and Rialto.

107.    Defendants Lennar and Rialto consumed those reports, used them, and could not return them to Reis.

21

108.    Defendants Lennar and Rialto have acted in willful disregard of Reis's proprietary rights in its reports.

109.    The value of the reports taken by Defendants Lennar and Rialto was at least $1,629,948.

110.    As a direct and proximate result of Defendants Lennar and Rialto's actions, Reis has suffered and will continue to suffer injury and damage in amount to be determined at trial, but not less than $1,629,948, exclusive of attorney's fees, costs, interest, and punitive damages.

## Count VIII
### (Aiding and Abetting, Civil Conspiracy for Conversion and Theft)

111.    Reis repeats and realleges the allegations of Paragraphs 1 through 110 of this Complaint as if fully set forth herein.

112.    Acting in concert with Rialto New York, the Doe Unauthorized Users downloaded at least 747 reports from the Reis Database without paying for them.

113.    The Doe Unauthorized Users have exercised control and ownership over each downloaded report, to the exclusion of Plaintiffs.

114.    As a result, Reis suffered damage in the form of a lost sale for each report taken by the Doe Unauthorized Users.

115.    The Doe Unauthorized Users consumed those reports, used them, and could not return them to Reis.

116.    The Doe Unauthorized Users have acted in willful disregard of Reis's proprietary rights in its reports.

117.    The value of the reports taken by the Doe Unauthorized Users was at least $277,412.

22

8200817

118.    Rialto New York conspired with the Doe Unauthorized Users to steal and convert Reis's proprietary reports.  Rialto New York took concerted action with the Doe Unauthorized Users to participate in a series of unlawful acts.  Rialto New York performed one or more overt acts pursuant to and in furtherance of the common scheme.  Among other things, Rialto New York provided its Reis credentials to the Doe Unauthorized Users.

119.    Rialto New York is therefore jointly and severally liable with the Doe Unauthorized Users for the damages caused by acts committed in furtherance of the conspiracy.

120.    As a direct and proximate result of Rialto New York and the Doe Unauthorized Users' actions, Reis has suffered and will continue to suffer injury and damage in an amount to be determined at trial, but not less than $277,412, exclusive of attorney's fees, costs, interest, and punitive damages.

121.    Rialto New York knew of the Doe Unauthorized Users' tortious conduct and provided substantial assistance to achieve it.  Rialto New York is therefore liable for aiding and abetting the Doe Unauthorized Users' tortious conduct.

## Count IX
### (Misappropriation)

122.    Reis repeats and incorporates the allegations of Paragraphs 1 through 121 of this Complaint as if set forth here.

123.    Defendants Lennar and Rialto downloaded 4,548 reports from the Reis Database without paying for them.

124.    Those reports were valuable, novel and original compilations of data used by Reis in its business.

125.    The reports were compiled at considerable expense to Reis and provided Reis with an advantage over its competitors.

23

8200817

126.    As set forth above, Reis did not allow access to the reports without payment or license and protected the reports contractually and technologically from unauthorized access.

127.    Defendants Lennar and Rialto improperly accessed and used the reports for their benefit without authorization by Reis.

128.    As a result, Reis was damaged for each report misappropriated by Defendants.

129.    The value of the reports taken by Lennar and Rialto is at least $1,629,948.

130.    Reis has suffered and will continue to suffer injury and damage in an amount to be determined at trial, but not less than $1,629,948, exclusive of attorney's fees, costs, interest, and punitive damages.

### Count X
### (Aiding and Abetting, Civil Conspiracy for Misappropriation)

131.    Reis repeats and incorporates the allegations of Paragraphs 1 through 130 of this Complaint as if set forth here.

132.    The Doe Unauthorized Users downloaded at least 747 reports from the Reis Database without paying for them.

133.    Those reports were valuable, novel and original compilations of data used by Reis in its business.

134.    The reports were compiled at considerable expense to Reis and provided Reis with an advantage over its competitors.

135.    As set forth above, Reis did not allow access to the reports without payment or license and protected the reports contractually and technologically from unauthorized access.

136.    The Doe Unauthorized Users improperly accessed and used the reports for their benefit without authorization by Reis.

137.    As a result, Reis was damaged for each report misappropriated by the Doe Unauthorized Users.

138.    The value of the reports taken by the Doe Unauthorized Users is at least $277,412.

139.    Reis has suffered and will continue to suffer injury and damage in an amount to be determined at trial, but not less than $277,412, exclusive of attorney's fees, costs, interest, and punitive damages.

140.    Rialto New York conspired with the Doe Unauthorized Users to misappropriate Reis's proprietary reports.  Rialto New York took concerted action with the Doe Unauthorized Users to participate in a series of unlawful acts.  Rialto New York performed one or more overt acts pursuant to and in furtherance of the common scheme.  Among other things, Rialto New York provided its Reis credentials to the Doe Unauthorized Users.

141.    Rialto New York is therefore jointly and severally liable with the Doe Unauthorized Users for the damages caused by acts committed in furtherance of the conspiracy.

142.    Rialto New York knew of the Doe Unauthorized Users' tortious conduct and provided substantial assistance to achieve it.  Rialto New York is therefore liable for aiding and abetting the Doe Unauthorized Users' tortious conduct.

## Count XI
### (Unjust Enrichment)

143.    Reis repeats and incorporates the allegations of Paragraphs 1 through 142 of this Complaint as if set forth here.

144.    Defendants Lennar and Rialto have accessed, downloaded, and used $1,629,948 worth of reports from the Reis Database, but have provided no value in return to Reis.

25

8200817

145.    Thus, Defendants Lennar and Rialto have been unjustly enriched at the expense of Reis in an amount to be determined at trial, but at least $1,629,948.

146.    It is against equity and good conscience to permit Lennar and Rialto to retain the valuable information Rialto and Lennar used to launch a fund.

147.    Lennar and Rialto's actions were knowing, intentional, and willful.

148.    Lennar and Rialto are therefore liable to Reis in unjust enrichment in an amount to be determined at trial, but not less than $1,629,948, exclusive of attorney's fees, costs, interest, and punitive damages.

### Count XII
### (Aiding and Abetting, Civil Conspiracy for Unjust Enrichment)

149.    Reis repeats and incorporates the allegations of Paragraphs 1 through 148 of this Complaint as if set forth here.

150.    The Doe Unauthorized Users have accessed, downloaded, and used at least $277,412 worth of reports from the Reis Database, but have provided no value in return to Reis.

151.    The Doe Unauthorized Users have been unjustly enriched at the expense of Reis in an amount to be determined at trial, but at least $277,412.

152.    It is against equity and good conscience to permit the Doe Unauthorized Users to retain the valuable information for which Reis seeks to recover herein.

153.    The Doe Unauthorized Users' actions were knowing, intentional, and willful.

154.    The Doe Unauthorized Users are therefore liable to Reis in unjust enrichment in an amount to be determined at trial, but not less than $277,412, exclusive of attorney's fees, costs, interest, and punitive damages.

155.    Rialto New York conspired with the Doe Unauthorized Users to unjustly enrich the Doe Unauthorized Users.  Rialto New York took concerted action with the Doe Unauthorized

8200817

Users to participate in a series of unlawful acts.  Rialto New York performed one or more overt acts pursuant to and in furtherance of the common scheme.  Among other things, Rialto New York provided its Reis credentials to the Doe Unauthorized Users.

156.    Rialto New York is therefore jointly and severally liable with the Doe Unauthorized Users for the damages caused by acts committed in furtherance of the conspiracy.

157.    Rialto New York knew of the Doe Unauthorized Users' tortious conduct and provided substantial assistance to achieve it.  Rialto New York is therefore liable for aiding and abetting the Doe Unauthorized Users' tortious conduct.

### Count XIII
### (Quantum Meruit)

158.    Reis repeats and incorporates the allegations of Paragraphs 1 through 157 of this Complaint as if set forth here.

159.    Defendants Lennar and Rialto have received substantial economic benefit and competitive edge by accessing, downloading, and using proprietary reports from the Reis Database.

160.    Defendants Lennar and Rialto only obtained these benefits because they unlawfully accessed, downloaded, and used proprietary reports from the Reis Database for their own economic and competitive advantage.

161.    It is inequitable and unjust for Lennar and Rialto to have obtained the benefit of using the Reis Database for their own economic and competitive advantage without justly compensating Reis.

162.    As a direct and proximate result of Lennar and Rialto's actions, Reis has suffered and will continue to suffer injury and damage in an amount to be proven at trial, but at least $1,629,948.

8200817

163.     Defendants Lennar and Rialto are therefore liable to Reis in quantum meruit in an amount to be determined at trial, but not less than $1,629,948, exclusive of attorney's fees, costs, interest, and punitive damages.

### Count XIV
### (Civil Conspiracy for Quantum Meruit)

164.     Reis repeats and incorporates the allegations of Paragraphs 1 through 163 of this Complaint as if set forth here.

165.     The Doe Unauthorized Users have received substantial economic benefit and competitive edge by accessing, downloading, and using proprietary reports from the Reis Database.

166.     The Doe Unauthorized Users only obtained these benefits because they unlawfully accessed, downloaded, and used proprietary reports from the Reis Database for their own economic and competitive advantage.

167.     It is inequitable and unjust for the Doe Unauthorized Users to have obtained the benefit of using the Reis Database for their own economic and competitive advantage without justly compensating Reis.

168.     As a direct and proximate result of the Doe Unauthorized Users' actions, Reis has suffered and will continue to suffer injury and damage in an amount to be proven at trial, but at least $277,412.

169.     The Doe Unauthorized Users are therefore liable to Reis in quantum meruit in an amount to be determined at trial, but not less than $277,412, exclusive of attorney's fees, costs, interest, and punitive damages.

170.     Rialto New York conspired to help the Doe Unauthorized Users receive an unlawful benefit without compensating Reis.  Rialto New York took concerted action with the

28

8200817

Doe Unauthorized Users to participate in a series of unlawful acts.  Rialto New York performed one or more overt acts pursuant to and in furtherance of the common scheme.  Among other things, Rialto New York provided its Reis credentials to the Doe Unauthorized Users.

171.    Rialto New York is therefore jointly and severally liable with the Doe Unauthorized Users for the damages caused by acts committed in furtherance of the conspiracy.

### Prayer for Relief

WHEREFORE, Reis respectfully requests that the Court enter judgment in its favor and award the following relief against Defendants:

a.    An award against Defendants Lennar and Rialto for compensatory damages of at least $1,629,948, plus interest and costs;

b.    An award against Defendant Rialto New York for damages, at Reis's election, either (1) with respect to each copyright infringed, statutory damages in the amount of one hundred fifty thousand dollars ($150,000), or (2) Reis's damages and recapture of the Doe Unauthorized User and Rialto New York's profits;

c.    In the alternative to clause (b), an award against Defendant Rialto New York for compensatory damages of at least $277,412, plus interest and costs;

d.    That the Court award punitive damages in an amount to be determined at trial;

e.    That the Court award Reis its attorney's fees and expenses; and

f.    That the Court award Reis such other and further relief as is just and proper under the circumstances.

8200817

Dated:          New York, New York
                October 6, 2015                    By:  /s/ Geoffrey Potter
                                                   **Patterson Belknap Webb & Tyler**
                                                   **LLP**

                                                   Geoffrey Potter
                                                   Aron Fischer
                                                   Scott Caplan

                                                   1133 Avenue of the Americas
                                                   New York, New York 10036
                                                   (212) 336-2000
                                                   gpotter@pbwt.com
                                                   afischer@pbwt.com
                                                   scaplan@pbwt.com

                                                   *Attorneys for Plaintiffs Reis, Inc. and*
                                                   *Reis Services, LLC*

8200817