**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

|  |  |
|---|---|
| REIS, INC. and REIS SERVICES, LLC, | ) |
| | ) |
| | ) Case No. 1:15-cv-07905-GBD |
| Plaintiffs | ) |
| vs. | ) |
| | ) ECF Case |
| LENNAR CORP., RIALTO CAPITAL | ) |
| MANAGEMENT, LLC, and RIALTO | ) |
| CAPITAL ADVISORS OF NEW YORK, LLC, | ) ORAL ARGUMENT REQUESTED |
| | ) |
| Defendants. | |

**DEFENDANTS' MEMORANDUM OF LAW**
**IN SUPPORT OF THEIR MOTION TO DISMISS**

## TABLE OF CONTENTS

PRELIMINARY STATEMENT ................................................................................................ 1

FACTUAL BACKGROUND ................................................................................................... 2

    A.    The Reis Terms of Service .................................................................................. 3

    B.    The Lederman Account ....................................................................................... 4

    C.    The "Doe Unauthorized Users." ........................................................................ 5

    D.    Reis' Investigation. ............................................................................................ 6

ARGUMENT .......................................................................................................................... 7

I.    REIS HAS FAILED TO STATE ANY CLAIM ARISING OUT OF
    DEFENDANTS' ALLEGED USE OF THE LEDERMAN ACCOUNT. ..................... 7

    A.    Reis cannot state any claims under the Computer Fraud and Abuse Act
        (Count I). ............................................................................................................ 7

    B.    Reis cannot enforce its Terms of Service against Defendants (Count VI). .......... 12

    C.    Reis has not pled the requisite elements of fraud with "particularity" as
        required by Rule 9(b) (Count V) ......................................................................... 14

    D.    Reis cannot state a claim for "conversion" (Count VII). ..................................... 17

    E.    Reis' reports cannot be the subject of a "misappropriation" claim (Count
        IX). .................................................................................................................... 18

    F.    Reis cannot use quasi-contract claims to enforce its contractual rights with
        nonparties (Counts XI and XIII). ........................................................................ 20

II.    REIS CANNOT STATE ANY CLAIMS BASED ON THE ALLEGED
    DOWNLOADS BY THE SO-CALLED "DOE UNAUTHORIZED USERS." ......... 21

    A.    There is no allegation that Rialto New York breached its subscription
        agreement with Reis. .......................................................................................... 21

    B.    Reis' claims for secondary liability relating to the "Doe Users" all fail. ............. 24

III.    REIS FAILS TO STATE ANY CLAIMS AGAINST LENNAR
    CORPORATION. ................................................................................................... 25

CONCLUSION ...................................................................................................................... 25

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Abu Dhabi Commercial Bank v. Morgan Stanley & Co. Inc.*,
    651 F. Supp. 2d 155 (S.D.N.Y. 2009)......................................................................24

*Air Atlanta Aero Eng'g Ltd. v. SP Aircraft Owner I LLC*,
    674 F. Supp. 2d 547 (S.D.N.Y. 2009)......................................................................19

*Architectronics, Inc. v. Control Sys., Inc.*,
    935 F. Supp. 425 (S.D.N.Y. 1996)...........................................................................19

*Ashcroft v. Iqbal*,
    556 U.S. 662, 129 S. Ct. 1937, 173 L. Ed. 2d 868 (2009)........................................6

*Be In, Inc. v. Google Inc.*,
    No. 12 Civ. 3373, 2013 WL 5568706 (N.D. Cal. Oct. 9, 2013)...............................13

*Bell Atl. Corp. v. Twombly*,
    550 U.S. 544 (2007)..................................................................................................6

*Berkson v. Gogo LLC*,
    No. 14-CV-1199, 2015 WL 1600755 (E.D.N.Y. Apr. 9, 2015) ...............................12

*Big Apple Consulting USA, Inc. v. Belmont Partners, LLC*,
    No. 23105/07, 2008 WL 4210533 (Sup. Ct. Sept. 15, 2008)...................................16

*Blank v. Pollack*,
    916 F. Supp. 165 (N.D.N.Y. 1996)..........................................................................19

*Brown v. Royal Carribean Cruises, Ltd.*,
    No. 99-ICIV.2435, 99CIV.11774KMW, 2000 WL 34449703 (S.D.N.Y. 2000) ...................14

*Capitol Audio Access, Inc. v. Umemoto*,
    980 F. Supp. 2d 1154 (E.D. Cal. 2013)......................................................................8

*Chambers v. Time Warner, Inc.*,
    282 F.3d 147 (2d Cir. 2002)................................................................................3, 11

*CoStar Realty Info., Inc. v. Field*,
    737 F. Supp. 2d 496 (D. Md. 2010) ..........................................................................9

*Crigger v. Fahnestock & Co.*,
    443 F.3d 230 (2d Cir. 2006).....................................................................................16

*Cvent, Inc. v. Eventbrite, Inc.*,
    739 F. Supp. 2d 927 (E.D. Va. 2010) ......................................................................13

*Del Monte Fresh Produce, N.A., Inc. v. Chiquita Brands Int'l Inc.*,
   616 F. Supp. 2d 805 (N.D. Ill. 2009) ................................................................10

*Elektra Entm't Grp., Inc. v. Santangelo*,
   No. 06 CIV. 11520 (SCR)(MDF), 2008 WL 4452393 (S.D.N.Y. Oct. 1, 2008)...................23

*Farmers Ins. Exch. v. Steel Ins. Agency, Inc.*,
   No. 2:13-CV-00784-MCE, 2013 WL 6070488 (E.D. Cal. Nov. 14, 2013)...........................24

*Faulkner v. Nat'l Geographic Enters. Inc.*,
   409 F.3d 26 (2d Cir. 2005).....................................................................................23

*Fed. Treasury Enter. Sojuzplodoimport v. SPI Spirits Ltd.*,
   726 F.3d 62 (2d Cir. 2013).....................................................................................6

*Ferring B.V. v. Allergan, Inc.*,
   4 F. Supp. 3d 612, 627 (S.D.N.Y. 2014)..............................................................18

*Fteja v. Facebook, Inc.*,
   841 F. Supp. 2d 829 (S.D.N.Y. 2012)..................................................................13

*Geo Group, Inc. v. Cmty. First Servs., Inc.*,
   No. 11 Civ. 1711, 2012 WL 1077846 (E.D.N.Y. Mar. 30, 2012) ...........................17

*Grynberg v. Eni S.p.A.*,
   No. 06 CIV. 6495 (RLC), 2007 WL 2584727 (S.D.N.Y. Sept. 5, 2007) ................20

*Health & Cmty. Living, Inc. v. Goldis Fin. Grp., Inc.*,
   No. 96 CV 0459, 1998 WL 117928 (E.D.N.Y. Mar. 13, 1998) .............................12

*Hines v. Overstock.com, Inc.*,
   380 F. App'x 22 (2d Cir. 2010) ...........................................................................13

*In re BitTorrent Adult Film Copyright Infringement Cases*,
   296 F.R.D. 80 (E.D.N.Y. 2013) ..............................................................21, 22, 23

*In re S. African Apartheid Litig.*,
   633 F. Supp. 2d 117 (S.D.N.Y. 2009)..................................................................24

*JBCHoldings NY, LLC v. Pakter*,
   931 F. Supp. 2d 514 (S.D.N.Y. 2013)..............................................................21, 22

*Jinno Int'l Co. v. Premier Fabrics, Inc.*,
   12–cv–07820, 2013 WL 4780049 (S.D.N.Y. May 24, 2013).................................18

*JP Morgan Chase Bank v. Winnick*,
   350 F. Supp. 2d 393 (S.D.N.Y. 2004)..................................................................15

*Karmilowicz v. Hartford Fin. Servs. Group, Inc.*,
   494 Fed. App'x 153 (2d Cir. 2012).......................................................................19

*Lehman v. Dow Jones & Co.*,
    783 F.2d 285 (2d Cir. 1986).........................................................................18, 19

*Melcher v. Apollo Med. Fund Mgmt, L.L.C.*,
    105 A.D.3d 15 (1st Dep't 2013) ................................................................19, 20

*Montalvo v. LT's Benjamin Records, Inc.*,
    56 F. Supp. 3d 121 (D.P.R. 2014)......................................................................24

*Moses v. Martin*,
    360 F. Supp. 2d 533 (S.D.N.Y. 2004)................................................................17

*Nebraskaland, Inc. v. Brody*,
    No. 09 CIV. 9155 (DAB), 2010 WL 157496 (S.D.N.Y. Jan. 13, 2010)..................8

*NetApp, Inc. v. Nimble Storage, Inc.*,
    No. 5:13-CV-05058-LHK(HRL), 2015 WL 400251 (N.D. Cal. Jan. 29, 2015).....24

*Nexans Wires S.A. v. Sark-USA, Inc.*,
    166 F. App'x 559 (2d Cir. 2006) ....................................................................7, 10

*Olsen v. Pratt & Whitney Aircraft, Div. of United Techs. Corp.*,
    136 F.3d 273 (2d Cir. 1998).................................................................................14

*Patrick Collins, Inc. v. Doe 1*,
    288 F.R.D. 233 (E.D.N.Y. 2012).........................................................................22

*Pure Power Boot Camp, Inc. v. Warrior Fitness Boot Camp, LLC*,
    813 F. Supp. 2d 489 (S.D.N.Y. 2011)................................................................17

*Register.com, Inc. v. Verio, Inc.*,
    126 F. Supp. 2d 238 (S.D.N.Y. 2000)..................................................................8

*Reis, Inc. v. Doe*,
    No. 14 Civ. 9098 (GBD), Doc. 1 (S.D.N.Y. Nov. 14, 2014).............................22

*Reis Inc. v. Doe*,
    No. 15 Civ. 6656, Doc. 1 (S.D.N.Y. Aug. 21, 2015).......................................6, 10

*Reis, Inc. v. Spring11 LLC*,
    No. 15 Civ. 2836 (PGG), Doc. 18 (S.D.N.Y. Aug. 10, 2015) ..........................6, 10

*Reis v. Armada Analytics, Inc.*,
    No. 15 Civ. 7097 (AJN), Doc. 1 (S.D.N.Y. Sept. 9, 2015)..............................6, 10

*S.Q.K.F.C., Inc. v. Bell Atl. TriCon Leasing Corp.*,
    84 F.3d 629 (2d Cir. 1996).................................................................................14

*SCM Group, Inc. v. McKinsey & Co.*,
    No. 10 Civ. 2414, 2011 WL 1197523 (S.D.N.Y. Mar. 28, 2011) .........................19

*Sewell v. Bernardin*,
  795 F.3d 337 (2d Cir. 2015)................................................................11

*Tan v. Doe*,
  No. 14-CV-2663 ALC, 2014 WL 1779048 (S.D.N.Y. May 5, 2014) ......................................8

*TechnoMarine SA v. Giftports, Inc.*,
  758 F.3d 493 (2d Cir. 2014)................................................................7

*Trustforte Corp. v. Eisen*,
  No. 600521/2005, 2005 WL 3501587 (Sup. Ct. Nov. 15, 2005)...........................................17

*UST Private Equity Inv'rs Fund v Salomon Smith Barney*,
  288 A.D. 2d 87 (1st Dep't 2001) .........................................................16

*Valassis Commc'ns, Inc. v. Weimer*,
  304 A.D.2d 448 (1st Dep't 2003) .......................................................15

*Vigilant Ins. Co. of Am. v. Hous. Auth. of City of El Paso, Tex.*,
  87 N.Y.2d 36, 660 N.E.2d 1121 (1995)...................................................18

*Wolk v. Kodak Imaging Network, Inc.*,
  840 F. Supp. 2d 724 (S.D.N.Y. 2012).....................................................23

**Statutes**

18 U.S.C.A. § 1030(e)(8)................................................................11

18 U.S.C.A. § 1030(g)................................................................7, 11

18 U.S.C. § 1030................................................................7

18 U.S.C. § 1030(a)(4)................................................................7

18 U.S.C. § 1030(c)(4)(A)(i)(I)................................................................7, 11

18 U.S.C. § 1030(c)(4)(A)(i)(I)-(V)................................................................7

18 U.S.C. § 1030(e)(11)................................................................8, 9

**Rules**

C.P.L.R. § 214................................................................18

Fed. R. Civ. P. 9(b)................................................................1, 14

Fed. R. Civ. P. 11................................................................1

## PRELIMINARY STATEMENT

This is the ninth lawsuit Reis has filed in this Court in just over a year, each one alleging that different defendants accessed, or allowed others to access, Reis' subscription database without authorization. Remarkably, in each one of these lawsuits, Reis blames a different defendant for the the exact same alleged "loss"—namely, the "time, money, and resources" that Reis allegedly expended to develop software to investigate the "intrusions" into its database. In more recent filings, Reis has even reduced the amount of the "loss" to a precise number: $76,364. Testing the limits of Rule 11, Reis has laid the blame for this $76,364 at the feet of every one of the defendants it has named in the numerous lawsuits it has filed over the past year.

Defendants Lennar, Rialto, and Rialto New York are the latest. As with its prior suits, Reis alleges that Defendants have accessed, or allowed others to access, Reis' database without authorization. As with its prior suits, Reis has asserted claims under the CFAA, as well as a litany of common law claims. And, as with its prior suits, Reis alleges that Defendants here caused it to suffer *the same $76,364 in costs* that it is already seeking from dozens of other defendants. These types of assembly-line litigation tactics are unsuccessful here. Reis' Complaint fails to state a single claim upon which relief can be granted:

- **CFAA (Counts I and II).** In Counts I and II, Reis asserts claims under the Computer Fraud and Abuse Act, claiming that Defendants improperly accessed, or allowed others to access, Reis' online database. Reis' CFAA claims fail as a matter of law because Reis has not suffered any "loss" as defined by the statute. Moreover, Reis' CFAA claims arose in 2009 and 2010 and are time-barred under the CFAA's two-year statute of limitations.

- **Fraud (Count V).** In Count V, Reis asserts a claim for common law fraud, claiming that Defendants defrauded Reis by accessing the Reis database. This claim fails as a matter of law because Reis has not pled any of the requisite elements of fraud, let alone with "particularity" as required by Federal Rule of Civil Procedure 9(b).

- **Breach of Contract (Count VI).** In Count VI, Reis first alleges that Defendants violated Reis' Terms of Service by accessing the database without

1

authorization.  This claim fails because Reis' Terms of Service is a "browsewrap" agreement that is not enforceable against Defendants.  Reis also alleges that Rialto New York breached its subscription agreement with Reis by sharing its login credentials with certain "unauthorized Doe users."  Reis has no plausible basis to assert that the unidentified "Doe users" are also "unauthorized."

- **Conversion (Count VII).**  In Count VII, Reis claims that Defendants converted Reis' electronic reports by downloading copies of those reports from Reis' database.  New York law is clear, however, that making copies of electronic documents does not constitute conversion.  Because Reis cannot show that it was denied access to the electronic reports that Defendants allegedly downloaded, it cannot state a claim for conversion.

- **Misappropriation (Count IX).**  In Count IX, Reis asserts what appears to be a claim for misappropriation of trade secrets.  But there are no trade secrets at issue in this case.  The reports that Defendants allegedly downloaded from Reis' database are the very same products that Reis sells to the public.  Such reports, by definition, are not protectable trade secrets.

- **Unjust Enrichment (Count XI) and Quantum Meruit (Count XIII).**  In Counts XI and XIII, Reis asserts quasi-contract claims for Defendants' alleged unauthorized access of Reis' database.  These claims fail because New York law prohibits Reis from bringing quasi-contract claims against Defendants where those claims arise from the same subject matter as a contract with a third party.

- **Secondary Liability (Counts III, IV, VIII, X, XII, XIV).**  The remainder of Reis' claims—Counts III, IV, VIII, X, XII, XIV—are claims for secondary liability arising out of Rialto New York's alleged breach of its subscription agreement.  Because there is no primary violation of that agreement in the first instance, Reis' claims for secondary liability fail as a matter of law.

## FACTUAL BACKGROUND

Defendant Lennar Corp. ("Lennar") is a Delaware corporation based in Florida that concentrates on building single-family homes throughout the United States.  (Compl. ¶ 10.)[1] Defendant Rialto Capital Management LLC ("Rialto"), an indirect subsidiary of Lennar, is a private investment company focused on real estate investment and asset management and is a subsidiary of Lennar.  (*Id.* ¶ 11.)  Defendant Rialto Capital Advisors of New York ("Rialto New York") (together with Lennar and Rialto, the "Defendants") is an investment adviser firm and is

---

[1]    Unless otherwise specified, internal quotations and citations are omitted, and all emphasis has been added.

also a subsidiary of Lennar.  (*Id.* ¶ 12.)  Plaintiffs Reis, Inc. and Reis Services, LLC (together, "Reis") own and operate a subscription database (the "Reis Database") that provides debt and equity investors with information on various real estate properties.  (*Id.* ¶ 16.)  Reis sells access to its database on either a pay-as-you-go basis or through subscription agreements.  (*Id.* ¶ 20.)

A.      **The Reis Terms of Service.**

Reis offers access to its database through its website.  (*Id.* ¶¶ 20, 29-30.)  During the relevant time period, Reis' website contained a link to its "Terms of Service."  (*Id.* ¶ 30.)  That link was one of twenty-four different links located at the bottom of the page on its website.  (*Id.*) Users are not required to click the link to the Terms of Service, or otherwise view, access, review, or agree to the Terms of Service, to use the Reis website or access the Reis Database. (*See generally id.*)  To the contrary, users can use the Reis website and access the Reis Database and download material without ever clicking the link to the Terms of Service.  (*See id.* ¶ 30.)

In the event a third-party chose to click on the Terms of Service, those Terms stated that "all users" of the Reis Database "agree to be bound by the 'terms, conditions, and notices contained' in the Terms of Service" by virtue of their usage of the Reis Website.  (*See id.* ¶¶ 28, 30.)[2]  The Terms of Service also state that a user cannot "resell or transfer" access to the Reis Database or cause the "loss of a potential sale or subscription" to the database.  (*Id.* ¶ 27.)

---

[2]      A true and correct copy of Reis' current Terms of Service is attached as Exhibit A to the accompanying Declaration of Kuangyan Huang ("Huang Decl.") filed in support of this motion.  The Court may take judicial notice of the contents and terms of the Terms of Service and other documents referenced in the Complaint. *Chambers v. Time Warner, Inc.*, 282 F.3d 147, 153 (2d Cir. 2002).

### B.      The Lederman Account.

Reis alleges that Harvey Lederman joined Rialto in or about 2009, where he is still employed.[3]  (*Id.* ¶ 4.)  He does not work at Lennar.  (*See generally id.*)  Prior to working for Rialto, Mr. Lederman worked at an unrelated company up until 2003 (the "Former Employer").  (*Id.* ¶ 31.)  While Mr. Lederman was working there, his Former Employer had a subscription agreement to access and use the Reis Database.  (*Id.* ¶ 4.)  That agreement contained terms that "prohibit the use of credentials issued to one subscriber from being used for the benefit of another subscriber."  (*Id.*)  The agreement also incorporated Reis' Terms of Service, which provided that the Former Employer was required to "maintain and update" its user accounts and "to keep [that information] accurate, current, and complete."  (Ex. A, Terms of Service.)  While he was working there, Mr. Lederman's Former Employer issued login credentials to Mr. Lederman so that he could access the Reis Database (the "Lederman Account").  (Compl. ¶ 4.)

In 2003, Mr. Lederman left his Former Employer.  (*Id.* ¶ 31.)  Neither Reis nor Mr. Lederman's Former Employer cancelled the Lederman Account upon his departure from his Former Employer.  (*See generally id.*)  Reis alleges that the Lederman Account continued to be used from 2003 to 2010.  (*Id.* ¶ 32.)  Specifically, Reis claims that, between December 2009 and October 2010, Lennar and Rialto used the Lederman Account to download 4,547 reports from the Reis Database.  (*Id.*)  Reis does not identify who from Lennar or Rialto used Mr. Lederman's credentials.  (*See generally id.*)  Even though Reis states that its "Compliance Group diligently investigates unusual patterns of use and other signs of possible theft of [] data from the Reis

---

[3]      For the purposes of this motion, the factual allegations in Reis' Complaint are assumed to be true.  Defendants note, however, that Mr. Lederman is employed by Rialto New York and does not work for Rialto or Lennar. Nothing herein may be construed as an admission otherwise.

Database," Reis claims that it did not learn that Mr. Lederman left his Former Employer in 2003 until June 2015, roughly twelve years later. (*Id.* ¶¶ 3, 31.)

In October 2010, Reis alleges that Lennar's and Rialto's use of the Lederman Account ceased. (*Id.* ¶ 35.) Reis does not allege that Lennar or Rialto ever stopped, disrupted, or interrupted Reis' ability to provide the Reis Database as a service. (*See generally id.*) Nor does Reis ever allege that any of its data, systems, or information were destroyed, impaired, or otherwise affected by Lennar's or Rialto's actions. (*Id.*)

**C.      The "Doe Unauthorized Users."**

In November 2010, Rialto New York entered into its own subscription agreement with Reis to use the Reis Database. (*Id.* ¶ 35.) Neither Lennar nor Rialto are parties to that agreement.[4] Pursuant to this agreement, Rialto New York provided Reis with a list of employees that would be authorized users of the Reis Database in November 2010. (Ex. B, Rialto New York Subscription Agreement and User List.) That list of authorized users included Harvey Lederman. (*Id.*) Thus, contrary to Reis' claim that it did not know that Mr. Lederman had left his former employer until 2015, (Compl. ¶ 31), Rialto New York informed Reis in November 2010 that Mr. Lederman now worked for Rialto New York (Ex. B, Rialto New York Subscription Agreement and User List). Rialto New York's subscription agreement with Reis prohibits Rialto New York from sharing its login credentials with an unauthorized user. (Compl. ¶ 37.) However, nothing in that subscription agreement restricts the locations or IP addresses from which Rialto New York's employees could access the Reis Database. (*See generally id.*)

In 2015, Reis purportedly "uncovered" evidence that, between May 2013 and August 2015, the Reis Database had been accessed from two IP addresses—67.136.101.2 and

---

[4]    A true and accurate copy of an email attaching the signed subscription agreement between Reis and Rialto New York and the list of Rialto New York's authorized users is attached to the Huang Decl. as <u>Exhibit B</u>.

173.11.106.97—using credentials issued to Rialto New York.  (Compl. ¶ 36.)  Reis claims that an unknown number of unidentified users downloaded roughly 747 reports from the Reis Database from these two IP addresses.  (*Id.*)  Even though Reis does not, and cannot, identify the individuals that allegedly accessed Reis' Database from these IP addresses, Reis speculates that they are not among Rialto New York's authorized users, referring to them as "unknown unauthorized users" or "Doe Unauthorized Users."  (*Id.* ¶ 1.)

### D.     Reis' Investigation.

Reis asserts that, as a result of Defendants' actions, Reis has had "to conduct an investigation into [Defendants'] intrusion and a damages assessment."  (*Id.* ¶ 65.)  In particular, Reis claims that Defendants' actions have forced Reis to "develop[] its own proprietary investigatory software at a cost of $76,364 in hourly wages of Reis developers from June 2014 through May 2015," (*id.* ¶ 67), and caused Reis' Vice President of Product Development and Intellectual Property to spend "on average $4,900 per month of time in 2014 and 2015 using this investigatory software tool to identify piracy," (*id.* ¶ 72).  Though Reis now attributes these costs to Defendants, in other lawsuits pending before this court, Reis alleged that it spent the exact same $76,364 investigating the unauthorized use of the Reis Database by different individuals and entities.  *See Reis, Inc. v. Spring11 LLC*, No. 15 Civ. 2836 (PGG), Doc. 18 (S.D.N.Y. Aug. 10, 2015); *Reis Inc. v. Doe*, No. 15 Civ. 6656, Doc. 1 (S.D.N.Y. Aug. 21, 2015); *Reis v. Armada Analytics, Inc.*, No. 15 Civ. 7097 (AJN), Doc. 1 (S.D.N.Y. Sept. 9, 2015).[5]

---

[5]     True and accurate copies of the complaints in these actions are attached to the Huang Decl. as <u>Exhibits C, D and E</u>.

<u>**ARGUMENT**</u>

**I.      REIS HAS FAILED TO STATE ANY CLAIM ARISING OUT OF DEFENDANTS' ALLEGED USE OF THE LEDERMAN ACCOUNT.**

To survive a motion to dismiss, a complaint "must plead enough facts to state a claim to relief that is plausible on its face." *Fed. Treasury Enter. Sojuzplodoimport v. SPI Spirits Ltd.*, 726 F.3d 62, 71 (2d Cir. 2013); *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007).  The plaintiff must plead sufficient "factual content" to "allow[] the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 663, 129 S. Ct. 1937, 1940, 173 L. Ed. 2d 868 (2009).  Mere "labels and conclusions" do not satisfy the need for plausible factual allegations, and a complaint may not rely on a "formulaic recitation of the elements of a cause of action." *TechnoMarine SA v. Giftports, Inc.*, 758 F.3d 493, 505 (2d Cir. 2014).  Based on Defendants' alleged use of the Lederman Account from October 2009 to October 2010, Reis has asserted claims under the Computer Fraud and Abuse Act ("<u>CFAA</u>") (Count I), as well as claims for common law fraud (Count V), breach of contract (Count VI), conversion (Count VII), misappropriation (Count IX), unjust enrichment (Count XI), and quantum meruit (Count XIII).  None of these claims survives scrutiny.

**A.      Reis cannot state any claims under the Computer Fraud and Abuse Act (Count I).**

Count I of Reis' Complaint is for Defendants' alleged violation of the Computer Fraud and Abuse Act, codified at 18 U.S. Code § 1030 *et seq.*  The CFAA is a targeted anti-hacking statute that provides a limited civil cause of action for "[a]ny person who suffers damage or loss" caused directly by computer hacking—defined, in relevant part, as another party "knowingly and with intent to defraud, access[ing] a protected computer without authorization" or in excess of "authorized access." *See* 18 U.S.C. §§ 1030(a)(4), 1030(g).

This statute has no application here.  In order to state a civil cause of action under the CFAA, a plaintiff must allege that the conduct at issue satisfies one of five different factors.  *See* 18 U.S.C. §§ 1030(g), 1030(c)(4)(A)(i)(I)-(V).  The only qualifying factor alleged in Reis' Complaint is set forth in 18 U.S.C. § 1030(c)(4)(A)(i)(I), which permits a civil action ***only*** if the conduct in question caused some sort of "loss" to Reis "aggregating at least $5,000 in value" over one year.  (Compl. ¶¶ 41-57.)  Thus, in order to state its CFAA claims, Reis must allege that Defendants' actions caused it to suffer a recoverable "loss" as that term is defined by the CFAA.  *Nexans Wires S.A. v. Sark-USA, Inc.*, 166 F. App'x 559, 562 (2d Cir. 2006) (affirming dismissal where alleged losses were not "cognizable" under the CFAA).  The CFAA defines "loss" narrowly as either (i) "any reasonable cost to any victim, including the cost of responding to an offense, conducting a damage assessment, and restoring the data, program, system, or information to its condition prior to the offense," or (ii) "any revenue lost, cost incurred, or other consequential damages incurred because of interruption of service."  18 U.S.C. § 1030(e)(11).

Neither type of "loss" is present in this case.  Reis' primary claim of "loss" is that it suffered $1,629,948 in "lost retail value" because Lennar and/or Rialto allegedly downloaded 4,548 reports using Mr. Lederman's credentials.  (Compl. ¶¶ 1, 45.)  Reis' alleged "loss" is insufficient as a matter of law because the CFAA does not compensate plaintiffs for lost sales or revenues.  In order for lost sales or revenue to qualify as compensable "losses" under the CFAA, those sales or revenues must be lost as the immediate and direct result of ***an "interruption of service"*** caused by the Defendants' bad acts.  *See* 18 U.S.C. § 1030(e)(11).  If no such interruption occurred, there can be no "loss" as a matter of law.  *See Nebraskaland, Inc. v. Brody*, No. 09 CIV. 9155 (DAB), 2010 WL 157496, at *3 (S.D.N.Y. Jan. 13, 2010) (denying CFAA claim for lost revenue where there were no allegations that plaintiffs' computer systems

experienced a disruption in service); *Register.com, Inc. v. Verio, Inc.*, 126 F. Supp. 2d 238, 252 n.12 (S.D.N.Y. 2000) (losses resulting from extraction of data could not be addressed under the CFAA unless the extraction impaired the plaintiff's systems); *Tan v. Doe*, No. 14-CV-2663 ALC, 2014 WL 1779048, at *2 (S.D.N.Y. May 5, 2014) ("Downloading and circulating even confidential information from a computer is not enough" to cause the requisite "damage" or "loss" to fall "within the meaning of the [CFAA] statute."). Other courts that have addressed this issue are in accord.[6]

Here, Reis has not alleged that Defendants' conduct caused any interruption of Reis' services. (*See* Compl. ¶¶ 41-57.) Indeed, Reis does not allege that it suffered **any** interruption of services at any point in time, let alone an interruption specifically caused by the use of Mr. Lederman's credentials. (*See generally id.*) Reis alleges only that Defendants used Mr. Lederman's credentials to download Reis' reports by logging onto Reis' systems. Regardless of whether Defendants' access was "authorized," the fact remains that Reis does not, and cannot, contend that Defendants caused any actual harm to Reis' data, programs, systems, or information by using them, much less harm that resulted in an "interruption in service." *See* 18 U.S.C. § 1030(e)(11). To the contrary, Reis concedes that the Lederman Account was continuously used from 2003 to 2010 without issue. (*Id.* ¶ 31.) Thus, the mere allegation that Reis lost the "retail value" it would have gained for sales of its reports is not a compensable "loss" under the CFAA. *CoStar Realty Info., Inc.*, 737 F. Supp. 2d at 514 ("profits lost as a result of the Defendant's

---

[6]   *See also Capitol Audio Access, Inc. v. Umemoto*, 980 F. Supp. 2d 1154, 1158 (E.D. Cal. 2013) (dismissing CFAA claim asserted by online news publisher against a subscriber who had shared his password with over 100 other people because plaintiff failed to "sufficiently allege that Defendant caused 'loss' because of interruption of service"); *CoStar Realty Info., Inc. v. Field*, 737 F. Supp. 2d 496, 515 (D. Md. 2010) ("[A] violation of the CFAA must cause an interruption of service in order for lost revenue to constitute as a qualifying 'loss' under the statute . . . .").

circumvention of the license fee charged for access to [a] passcode-protected database" did not satisfy CFAA's "loss" requirement).

Reis also alleges that it suffered a second type of "loss"—namely, the costs it incurred to "conduct an investigation into the [Defendants'] intrusion," which purportedly include $76,364 to develop proprietary software to "investigate [Defendants'] unauthorized intrusions into the Reis Database" and the time spent "using this investigatory software tool to identify piracy." (Compl. ¶¶ 47, 54, 65.)  Reis cannot shoehorn the costs of its so-called "investigation" into the CFAA's narrow definition of "loss."  While "loss" may include an assessment of "damage" to "data, program, system, or information" caused by hacking, 18 U.S.C. § 1030(e)(11), Reis has not alleged any damage to its data, programs, systems, or information, and thus its investigation could not pertain to any such damage.  Instead, as Reis itself concedes, the purpose of its investigations was to "identify suspicious patterns of usage" and "***determine whether the usage is licensed or not***." (*Id*. ¶ 51 (emphasis added).)  The CFAA does not encompass costs associated with an investigation into alleged business losses.  *See Nexans Wires S.A.*, 166 F. App'x at 563 ("[T]he record indicates that the sole focus of the New York meetings was the business loss associated with the misappropriation.  No court has construed the CFAA's loss definition to extend that far."); *Del Monte Fresh Produce, N.A., Inc. v. Chiquita Brands Int'l Inc*., 616 F. Supp. 2d 805, 813 (N.D. Ill. 2009) (dismissing plaintiff's CFAA claim where alleged "damages assessment" was unrelated to any damage to its computers or systems).

Even if the costs of Reis' investigation could be deemed "losses" under the CFAA, Reis' claim that these costs were caused by Defendants' actions is belied by Reis' allegations in its numerous prior lawsuits.  In fact, in at least three other actions pending before this Court, Reis has alleged that it spent an identical sum—$76,364—developing the same "proprietary" software

in response to, and in order to investigate, unauthorized usage *by other unrelated parties*.  (*See* Ex. C, *Reis, Inc. v. Spring11 LLC*, No. 15 Civ. 2836 (PGG), Doc. 18 (S.D.N.Y. 2015) ("As part of the on-going investigation of Spring11's surreptitious access and use . . . Reis developed its own proprietary investigatory software at a cost [of] $76,364."); Ex. D, *Reis Inc. v. Doe*, No. 15 Civ. 6656, Doc. 1 (S.D.N.Y. Aug. 21, 2015) ("As part of an ongoing investigation into Defendants' anonymous access . . . Reis developed its own proprietary software at a cost of $76,364."); *id*. ("Reis's Vice President of Product Development and Intellectual Property spent on average $4,900 per month of time in 2014 and 2015 using this investigatory software tool to identify piracy."); Ex. E, *Reis v. Armada Analytics, Inc.*, No. 15 Civ. 7097, Doc. 1 (AJN) (S.D.N.Y. Sept. 9, 2015) (same).)  As set forth above, to sustain a CFAA claim, Reis must plausibly allege that Defendants' conduct specifically "caused" the purported "loss" in question. 18 U.S.C. §1030(c)(4)(A)(i)(I).  Reis cannot credibly claim that Defendants here caused it to incur the "costs" of an investigation when it has already hung the blame for those costs on the conduct of different parties.  Because Reis fails to allege a recoverable "loss" under the CFAA, its claims must be dismissed.

Lastly, Reis' CFAA claims must be dismissed for another reason: they are time-barred. Civil claims under the CFAA must be brought within two years of "the date of the act complained of or the date of the discovery of the damage."  18 U.S.C.A. § 1030(g), (e)(8).  The conduct giving rise to Reis' CFAA claims is Defendants' alleged unauthorized use of the Lederman Account.  According to Reis, that conduct began in December 2009 and ended in October 2010—approximately five to six years before it filed this action.  (Compl. ¶ 35.)  Where, as here, "it is clear from the face of the complaint, and matters of which the court may take judicial notice, that the plaintiff's claims are barred as a matter of law," the complaint must be

dismissed.  *Sewell v. Bernardin*, 795 F.3d 337, 339 (2d Cir. 2015) (affirming in part dismissal of CFAA claim as time-barred).

Reis attempts to stave off dismissal by alleging that "Reis did not know until June 2015 . . . that [Mr. Lederman] had ***stopped working for his previous employer*** in 2003." (Compl. ¶ 31.)  This allegation is, put simply, false.  In November 2010, Reis entered into a subscription agreement with Rialto New York.  (*Id.* ¶ 35.)  That contract included a list of Rialto New York's authorized users—one of whom was Harvey Lederman.[7]  (*See* Ex. B.) Notwithstanding Reis' claims to the contrary, Reis was fully aware by November 2010 that Mr. Lederman no longer worked for his previous employer and any use of his credentials was "unauthorized."  As a consequence, the limitations period for Reis' CFAA claims expired in November 2012 at the latest, and Count I should be dismissed.

### B.   Reis cannot enforce its Terms of Service against Defendants (Count VI).

In Count VI of its Complaint, Reis claims that Lennar and Rialto "materially breached" the Terms of Service posted on Reis' website by utilizing the Lederman Account from October 2009 to October 2010.  (*See* Compl. ¶¶ 95-100.)  This claim fails as a matter of law.  In order for Reis to assert a claim for breach of contract, there must be a valid, enforceable contract.  *Health & Cmty. Living, Inc. v. Goldis Fin. Grp., Inc.*, No. 96 CV 0459, 1998 WL 117928, at *2 (E.D.N.Y. Mar. 13, 1998) (noting that the "formation of a contract" is an "essential element" of a breach of contract action).  There is no such contract to be enforced here.

---

[7]   Reis no doubt hoped to sidestep this issue by keeping a copy of the subscription agreement out of its Complaint. However, the Court may properly address this material on a motion to dismiss.  "[W]here plaintiff has actual notice of all the information in the movant's papers and has relied upon these documents in framing the complaint" the court may properly consider them on a motion to dismiss.  *Chambers*, 282 F.3d at 153 (affirming dismissal where movant attached contracts addressed in the complaint).  Reis has relied extensively on the subscription agreement when crafting this Complaint; indeed a number of its claims are based upon its terms. (*See* Compl. Counts II, III, IV, VI, VIII, X, XII, XIV.)

The alleged contract—Reis' Terms of Service—falls into a category of contracts that have been heavily scrutinized by courts in this circuit known as "browsewraps."  As explained by one court, "[b]rowsewraps can take various forms but basically the website will contain a notice that—by merely using the services of, obtaining information from, or initiating applications within the website—the user is agreeing to and is bound by the site's terms of service."  *Berkson v. Gogo LLC*, No. 14-CV-1199, 2015 WL 1600755, at *26 (E.D.N.Y. Apr. 9, 2015).  For such an agreement to be a binding and enforceable contract, consumers must have reasonable notice of such terms and ***exhibit "unambiguous assent"*** to them.   *Id.* at 19 ("Acceptance of a contract, in order to be effective, must be positive and unambiguous.").

In its Complaint, Reis alleges only that it "prominently displayed a link to the Terms of Service" on its webpage and that "[t]he Terms of Service is a valid, enforceable contract." (Compl. ¶¶ 97-98.)  According to Reis, the link to the Terms of Service "put users on notice that their access and use" of the website are subject to its terms.  (*Id.* ¶ 30.)  But that is, at most, only half of the formula.   In order for Reis' Terms of Service to be an enforceable browsewrap agreement, Reis must allege not only that Defendants had "notice" of those terms, but that Defendants "unambiguous[ly] assent[ed]" to those terms.  *Cvent, Inc.*, 739 F. Supp. 2d at 937-38; *Fteja v. Facebook, Inc.*, 841 F. Supp. 2d 829, 836 (S.D.N.Y. 2012) (collecting cases).  Nowhere does Reis make that allegation.  Reis does not allege that Defendants were required to click a button, link, or otherwise agree to the Terms of Service in order to use its website.  Reis does not even allege that Defendants were required to view the Terms of Service, much less assent to them.  Reis' conclusory assertion that the link placed users "on notice" is not enough to demonstrate mutual assent.  *See Hines v. Overstock.com, Inc.*, 380 F. App'x 22, 25 (2d Cir. 2010) (affirming dismissal where plaintiff alleged that users accepted the Terms and Conditions

merely by using the website and asserted no facts tending to show that a user would have had actual or constructive knowledge of the terms); *Be In, Inc. v. Google Inc.*, No. 12 Civ. 3373, 2013 WL 5568706, at *9 (N.D. Cal. Oct. 9, 2013) (applying New York and California law and dismissing claim for breach of browsewrap terms of service where plaintiff alleged that mere use of the website constituted agreement to its terms); *accord Cvent, Inc. v. Eventbrite, Inc.*, 739 F. Supp. 2d 927, 937 (E.D. Va. 2010) (granting motion to dismiss despite plaintiffs' conclusory allegation that the terms prominently displayed on its website and that defendants manifested assent to those terms "merely by accessing" plaintiff's website). Absent some allegation of facts demonstrating that Defendants did, in fact, assent to Reis' Terms of Service, Reis cannot state a breach of contract claim based on Defendants' alleged use of the Lederman Account.

### C.   Reis has not pled the requisite elements of fraud with "particularity" as required by Rule 9(b) (Count V).

To successfully plead a fraud claim under New York law, plaintiff must allege that a Defendant made a material, false representation with intent to defraud, that Reis reasonably relied on that representation, and that such representation and reliance resulted in some form of damage. *S.Q.K.F.C., Inc. v. Bell Atl. TriCon Leasing Corp.*, 84 F.3d 629, 633 (2d Cir. 1996). More than that, fraud claims are subject to the particularity requirements of Fed. R. Civ. P. 9(b), which requires that the complaint "specify what was said . . . (as opposed to the mere gist); who said it, and what positions were held by th[e] agents, servants, and employees whose words are alleged to bind or be imputed to the company . . . ." *Olsen v. Pratt & Whitney Aircraft, Div. of United Techs. Corp.*, 136 F.3d 273, 275-76 (2d Cir. 1998); *Brown v. Royal Carribean Cruises, Ltd.*, No. 99-ICIV.2435, 99CIV.11774KMW, 2000 WL 34449703, at *4 (S.D.N.Y. 2000) ("[T]he mere gist of the nature of the fraudulent statements insufficient to satisfy Rule 9(b)."). Reis has not satisfied any of these elements.

14

To begin, Reis does not identify the individual(s) making any of these alleged false representations, relying instead on a general averment that both "Lennar and Rialto" made the false statements.  (Compl. ¶ 92.)  This is not enough.  It is settled law that Reis must specifically *identify* the individual who made the false statement or representation at issue.  *Olsen*, 136 F.3d at 275-76.  The failure to identify the specific perpetrators of the alleged fraud, standing alone, is fatal to Reis' claim.

Nor has Reis identified any written or oral representations made by any Defendant to Reis.  This, too, is fatal.  The thrust of Reis' claim is that, when someone from Defendants entered the login credentials for the Lederman Account into the Reis Database, they were, in fact, affirmatively representing that they were using the database solely for the benefit of Mr. Lederman's Former Employer.  (Compl. ¶ 93.)  This theory can only succeed, however, if the unidentified actors from Lennar or Rialto accused of using the Lederman Account actually *knew* that the Lederman Account could only be used for the benefit of the Former Employer.  This requires those individuals to know the specific terms of Reis' subscription agreement with the Former Employer—which are the sole source of that restriction.  (*Id.* ¶ 4.)  Yet, here, Reis never alleges that the unnamed individual(s) from Lennar and/or Rialto who were allegedly using the Lederman Account knew of the existence of the subscription agreement between Reis and the Former Employer, much less the terms of that agreement.  (*See generally id.*)  Reis does not even allege that Mr. Lederman knew those terms.  (*Id.*)  Absent such allegations, Reis' theory that these employees implicitly represented an affiliation with the Former Employer must be rejected.

Reis' fraud claim fails for a third reason.  Nowhere in its Complaint does Reis allege that it relied on any of Defendants' purported misrepresentations.  Not only must Reis have relied on the false statements, its reliance must be justifiable.  *Valassis Commc'ns, Inc. v. Weimer,* 304

A.D.2d 448, 449 (1st Dep't 2003) (justifiable reliance is "essential to a claim for fraud").   "In assessing whether reliance on allegedly fraudulent misrepresentations is . . . justifiable, New York takes a contextual view, focusing on the level of sophistication of the parties, the relationship between them, and the information available at the time of the operative decision." *JP Morgan Chase Bank v. Winnick*, 350 F. Supp. 2d 393, 406 (S.D.N.Y. 2004).   Where the plaintiff "has the means of knowing, by the exercise of ordinary intelligence, the truth, or the real quality of the subject of the representation, ***he must make use of those means.***"   *Id.* (emphasis added).   Thus, before Reis can allege that it justifiably relied on Defendants' purported false representations, Reis must first assert that it exhausted the information and means available to it to ascertain the truth of those representations.   *See Big Apple Consulting USA, Inc. v. Belmont Partners, LLC*, No. 23105/07, 2008 WL 4210533, at *43 (Sup. Ct. Sept. 15, 2008) ("A party cannot claim justifiable reliance on a misrepresentation when that party could have discovered the truth with due diligence."); *Crigger v. Fahnestock & Co.*, 443 F.3d 230, 235 (2d Cir. 2006) ("Where sophisticated businessmen engaged in major transactions enjoy access to critical information but fail to take advantage of that access, New York courts are particularly disinclined to entertain claims of justifiable reliance.").

Reis' own allegations here foreclose any allegation of justifiable reliance.  Reis concedes elsewhere in its Complaint that it had the ability to discover the very facts that allegedly rendered Lennar's and Rialto's statements "false" at the time the statements were made.  Specifically, Reis acknowledges that it possessed a Compliance Group that monitors unauthorized usage. (Compl. ¶ 3.)  Reis also admits that it is able to identify the use of specific login credentials, track the number of times those credentials are used, and identify the IP addresses from which those credentials were used.  (*See id.* ¶¶ 31-32, 36.)  Because Reis possessed, but failed to

review, the very information on which it now bases its fraud claim, any reliance on the alleged misrepresentations was not justifiable. *UST Private Equity Inv'rs Fund v Salomon Smith Barney*, 288 A.D. 2d 87, 88 (1st Dep't 2001) (no justifiable reliance where "plaintiff failed to make use of the means of verification that were available to it").

### D.     Reis cannot state a claim for "conversion" (Count VII).

Count VII of Reis' Complaint is a claim for common law conversion based on Defendants' alleged use of the Lederman Account to view and download copies of Reis' reports. (Compl. ¶¶ 103-10.) To state a conversion claim, a plaintiff must allege: (1) the property subject to conversion is a specific identifiable thing; (2) plaintiff had ownership, possession, or control over the property before its conversion; and (3) defendant exercised an unauthorized dominion over the thing in question, to the alteration of its condition or to the exclusion of the plaintiff's rights. *Moses v. Martin,* 360 F. Supp. 2d 533, 541 (S.D.N.Y. 2004). In New York, "[t]he exercise of unauthorized dominion and control" over the property in question requires "the complete exclusion of the rightful possessor." *Geo Group, Inc. v. Cmty. First Servs., Inc.*, No. 11 Civ. 1711, 2012 WL 1077846, at *9 (E.D.N.Y. Mar. 30, 2012). Thus, in order to state a claim that electronic documents have been converted, plaintiffs must allege that defendants either destroyed the documents or denied plaintiffs access to the documents. *Trustforte Corp. v. Eisen*, No. 600521/2005, 2005 WL 3501587 (Sup. Ct. Nov. 15, 2005).

Reis cannot make that allegation here. While Reis claims that Defendants accessed and downloaded **copies** of Reis' reports without proper authorization, (Compl. ¶ 112), there is no allegation that Reis itself was ever denied **access** to its reports. Nor does Reis ever claim that Lennar and Rialto altered or destroyed any of Reis' files. Courts applying New York law have recognized that downloading a **copy** of an electronic document, by definition, does not "exclude" the original owner from that document. *Trustforte Corp. v. Eisen* is directly on point. 2005 WL

17

3501587.  In *Trustforte Corp.*, the plaintiff alleged that the defendant converted its electronic information by making copies of its customer lists and other electronic information.  *Id.* at *2.  There, as here, the plaintiffs "[did] not allege that any of the defendants did anything to exclude plaintiffs from exercising their rights over the information.  Rather the complaint indicate[d] that plaintiffs retained the information in question and were still able to use it."  *Id.* at *2.  Consequently, the court affirmed dismissal of plaintiffs' conversion claim.  *Id.*; s*ee also Pure Power Boot Camp, Inc. v. Warrior Fitness Boot Camp, LLC*, 813 F. Supp. 2d 489, 536 (S.D.N.Y. 2011) (conversion does not lie where defendant merely downloaded plaintiffs' client list; "[Defendant] possessed only a copy of the client list and did not, in any way, limit or otherwise deprive [plaintiff] of possession or use of that list.").  Here, as in *Trustforte Corp.*, Reis points to no facts showing that it was deprived access to its electronic reports.

Additionally, Reis' claim for conversion in Count VII is time-barred under New York's three-year limitations period for conversion claims.  C.P.L.R. § 214; *Vigilant Ins. Co. of Am. v. Hous. Auth. of City of El Paso, Tex.*, 87 N.Y.2d 36, 44, 660 N.E.2d 1121, 1126 (1995).  Reis' conversion claim accrued no later than October 2010, the date when the unauthorized use of the Lederman Account ceased.  (Compl. ¶ 31.)  Thus, the limitations period for Reis' conversion claim expired in October 2013.

### E.    Reis' reports cannot be the subject of a "misappropriation" claim (Count IX).

In Count IX of its Complaint, Reis purports to assert a claim for "misappropriation." (Compl. ¶¶ 122-30.)  Aside from cases involving a fiduciary duty, New York law does not recognize any "misappropriation" outside of misappropriation of trade secrets.  To the extent that is what Reis has attempted to assert in Count IX, that claim fails.

To bring a claim for misappropriation of a trade secret, a plaintiff must plausibly allege that it possesses a trade secret that the defendant wrongfully used. *Ferring B.V. v. Allergan, Inc.*, 4 F. Supp. 3d 612, 627 (S.D.N.Y. 2014). A trade secret "is a process or device for continuous use in the operation of the business." *Lehman v. Dow Jones & Co.*, 783 F.2d 285, 298 (2d Cir. 1986). The "most important" factor in determining whether information is a trade secret "***is whether the information is actually secret***." *Jinno Int'l Co. v. Premier Fabrics, Inc.,* 12–cv–07820, 2013 WL 4780049, at *4 (S.D.N.Y. May 24, 2013) (emphasis added).

Reis alleges that "Lennar and Rialto downloaded 4,548 reports from the Reis Database without paying for them." (Compl. ¶ 123.) These documents are not secret; to the contrary, Reis freely admits that they are publicly available to anyone willing to pay. (*Id.* ¶¶ 2, 126.) In other words, these are the very products that Reis peddles to the market and, as such, are not trade secrets as a matter of law. "[W]hen the process or device alleged to be a trade secret is the product of a business, rather than something used to run a business, it is not a trade secret." *Blank v. Pollack*, 916 F. Supp. 165, 174 (N.D.N.Y. 1996); s*ee Lehman*, 783 F.2d at 298 ("[T]he information at issue here was not used to run Lehman's business but was its product: like the car that rolls off the production line, this information was what Lehman had to sell.").

What's more, Reis' misappropriation claim is barred by the three-year statute of limitations. *Architectronics, Inc. v. Control Sys., Inc.*, 935 F. Supp. 425, 432 (S.D.N.Y. 1996). As with its claim for conversion, Reis' misappropriation claim accrued no later than October 2010, when the purported unauthorized use of the Lederman Account ceased. (Compl. ¶ 31.) As such, Reis' misappropriation claim expired in October 2013 and should be dismissed.

**F.**    **Reis cannot use quasi-contract claims to enforce its contractual rights with nonparties (Counts XI and XIII).**

Reis has also asserted claims for unjust enrichment and quantum meruit in Counts XI and XIII of its Complaint.   Unjust enrichment and quantum meruit are quasi-contract claims. *Karmilowicz v. Hartford Fin. Servs. Group, Inc.*, 494 Fed. App'x 153, 157 (2d Cir. 2012); *Air Atlanta Aero Eng'g Ltd. v. SP Aircraft Owner I LLC*, 674 F. Supp. 2d 547, 549 (S.D.N.Y. 2009). Under New York law "there can be no quasi-contract claim against a third-party non-signatory to a contract that covers the subject matter of the claim." *Melcher v. Apollo Med. Fund Mgmt, L.L.C.*, 105 A.D.3d 15, 27-28 (1st Dep't 2013) (collecting cases and affirming dismissal of claim); *SCM Group, Inc. v. McKinsey & Co.*, No. 10 Civ. 2414, 2011 WL 1197523, at *8 & n.4 (S.D.N.Y. Mar. 28, 2011).

The basis of Reis' quasi-contract claims is that Lennar and Rialto unlawfully accessed the Reis Database using valid credentials issued to another subscriber, Mr. Lederman's Former Employer. (*See* Compl. ¶¶ 4, 31, 144, 160.)   If anything, this is a breach of the Former Employer's subscription agreement by the Former Employer.  New York law prohibits Reis from bringing quasi-contract claims against Lennar and Rialto where Reis' claims arise directly from the same subject matter as a contract, namely, the subscription agreement with the Former Employer.  *See Melcher*, 105 A.D.3d at 27-28 (rejecting quasi-contract claim against a third party where claims arose from the same subject matter as the contract).   If the Former Employer's breached  subscription agreement, Reis' remedy is a contract claim against the Former Employer, not quasi-contract claims against Lennar and Rialto.  (*Id.* ¶¶ 4, 27.)

Reis' unjust enrichment claim is also time-barred.  Where, as here, a plaintiff seeks only monetary relief, any claim for unjust enrichment must be filed within three years of the conduct giving rise to the claim.  *Grynberg v. Eni S.p.A.*, No. 06 CIV. 6495 (RLC), 2007 WL 2584727, at

*3 (S.D.N.Y. Sept. 5, 2007).  Because the conduct underlying Reis' unjust enrichment claim

ended in October 2010, (Compl. ¶ 31), Reis was required to assert its claim by October 2013.  It

did not, so its claim is barred.

## II.    REIS CANNOT STATE ANY CLAIMS BASED ON THE ALLEGED DOWNLOADS BY THE SO-CALLED "DOE UNAUTHORIZED USERS."

Reis brings one direct (Count VI) and seven secondary claims (Counts II, III, IV, VIII, X,

XII, XIV) against Rialto New York for allegedly sharing the login credentials of its authorized

users with an unspecified number of "unauthorized" users who accessed the Reis Database from

two particular IP addresses.  The linchpin of these claims is Reis' allegation that these users are

not authorized to access the Reis Database under Rialto New York's subscription agreement.

(Compl. ¶ 7.)  This allegation is gutted, however, by Reis' simultaneous admission that it does

not know who these users are.  Reis cannot claim, on the one hand, that these users are

"unauthorized" and, on the other hand, admit that it does not know who these users are.  This

contradiction alone is sufficient grounds for the Court to dismiss these claims.

Despite being unable to identify any individuals that used Rialto New York's credentials,

Reis nonetheless claims that these "Doe Unauthorized Users" downloaded $277,412 worth of

Reis' reports without permission.  All of Reis' claims against Rialto New York fail because (1)

Reis does not adequately allege that Rialto New York ever breached the subscription agreement

and (2) Reis supports its claims for "conspiracy" and "aiding and abetting" with nothing more

than a formulaic recitation of the elements.

### A.    There is no allegation that Rialto New York breached its subscription agreement with Reis.

Reis' theory that Rialto New York "unlawfully shared its access with unknown

unauthorized users" stands upon one fact.  According to Reis, "between May 2013 and August

2015, *unidentified* persons associated with IP addresses 67.136.101.2 and 173.11.106.97" used

Rialto New York's login credentials to download reports from Reis' database.  (Compl. ¶ 36.)
Reis alleges that "on information and belief [these persons] are not associated with any
Defendant."  *Id.*  Strikingly, Reis offers no "information" nor facts that could support its "belief"
that the persons who accessed Reis' website from these IP addresses were not authorized users.
*JBCHoldings NY, LLC v. Pakter*, 931 F. Supp. 2d 514, 527 (S.D.N.Y. 2013) (holding that
allegations set forth "on information and belief . . . must be accompanied by a statement of facts
upon which the belief is founded.").  Numerous courts have held that IP addresses are not a
proxy for the identity of an individual.  Instead, "[a]n IP address provides **only the location** at
which one of any number of computer devices may be deployed, much like a telephone number
can be used for any number of telephones."  *See In re BitTorrent Adult Film Copyright
Infringement Cases*, 296 F.R.D. 80, 84 (E.D.N.Y. 2013) *report and recommendation adopted
sub nom. Patrick Collins, Inc. v. Doe 1*, 288 F.R.D. 233 (E.D.N.Y. 2012).

The Eastern District of New York dealt with this very situation in *In re BitTorrent*.
There, plaintiffs sought to hold Doe defendants responsible for infringing downloads of
copyrighted material.  *Id.*  There, as here, the plaintiffs sought early discovery of identities of
individuals associated with certain IP address.  *Id.*  The court quashed plaintiffs' request in part
because it acknowledged that plaintiffs' attempt to tie an individual to an IP address was
"tenuous" and purely speculative: "it is no more likely that the subscriber to an IP address carried
out a particular computer function . . . than to say an individual who pays the telephone bill made
a specific telephone call."  *Id.* at 84.  The court concluded that "although the complaints state
that . . . by discovering the individual associated with that IP address will reveal 'defendants'
true identity' [**that**] **is unlikely to be the case**."  *Id.* at 85.

This case is no different. Reis' allegation that its documents were downloaded from certain IP addresses fails to raise its claims against Rialto New York above a speculative level. *JBCHoldings NY, LLC*, 931 F. Supp. 2d at 527 ("[T]he plausibility requirement . . . asks for more than a sheer possibility that a defendant has acted unlawfully.").   At most, Reis' allegations suggest that its reports were downloaded from a certain location; they say nothing of the individual who downloaded the reports.   In fact, the deficiencies in Reis' pleadings in this lawsuit are most evident when compared to allegations they have made in other similar lawsuits before this Court.   In *Reis, Inc. v. Doe*, No. 14 Civ. 9098 (GBD), Doc. 1 (S.D.N.Y. Nov. 14, 2014), for example, Reis was able to connect certain IP addresses with unauthorized use because it alleged that the same login credentials were being used ***simultaneously*** from two different IP addresses located "hundreds of miles away" from each other.   (*Id.* ¶ 30.)   Two simultaneous users using the same account suggests that at least one of those users is unauthorized.   Tellingly, Reis makes no allegation of "simultaneous use" here.   Instead, Reis suggests only that its database was accessed from particular IP addresses it speculates are not associated with Rialto New York, nothing more.   Courts require more.   *See In re BitTorrent*, 296 F.R.D. at 84.   Absent a specific factual basis for its allegation that the "Doe Unauthorized Users" were, in fact, unauthorized users, Reis cannot state a breach of contract claim against Rialto New York.

The Court need not take Defendants' word that Reis does not know the identities of the so-called "unauthorized users."   Reis itself has made that clear.   In their November 10, 2015 application to this Court to take third-party discovery, Reis openly concedes that it does ***not*** know the "identities" of the "Doe" users.   (Reis' Letter Mot. for Expedited Disc. [D.I. 1] at 1.) Indeed, the purpose of Reis' improper discovery request is to figure out who these users are.   (*Id.* ("Reis seeks permission for expedited discovery . . . to identify two unknown Internet users

referenced in Reis' complaint.").)   Reis cannot state claims on the hope that subsequent discovery will cure its pleading failures.

   **B.      Reis' claims for secondary liability relating to the "Doe Users" all fail.**

   Because Reis cannot credibly allege that the "unknown" "DOE" users were also "unauthorized," there is no primary violation of the law here.   As such, Reis' catalog of secondary liability claims against Rialto New York fails.  *See Faulkner v. Nat'l Geographic Enters. Inc.,* 409 F.3d 26, 40 (2d Cir. 2005) ("[T]here can be no contributory infringement absent actual infringement."); *Wolk v. Kodak Imaging Network, Inc.*, 840 F. Supp. 2d 724, 750 (S.D.N.Y. 2012) ("[I]n order to hold a defendant secondarily liable someone else must have directly infringed on the copyright holder's rights."); *Elektra Entm't Grp., Inc. v. Santangelo*, No. 06 CIV. 11520 (SCR)(MDF), 2008 WL 4452393, at *7 (S.D.N.Y. Oct. 1, 2008) ("To state a claim for civil conspiracy, a plaintiff must plead the underlying primary tort.").

   Moreover, to state a claim for conspiracy, a plaintiff "must more clearly allege specific action on the part of each defendant that corresponds to the elements of a conspiracy cause of action."  *Farmers Ins. Exch. v. Steel Ins. Agency, Inc.*, No. 2:13-CV-00784-MCE, 2013 WL 6070488, at *14 (E.D. Cal. Nov. 14, 2013).   "[C]onclusory allegations of conspiracies are insufficient to support such claims." *NetApp, Inc. v. Nimble Storage, Inc.*, No. 5:13-CV-05058-LHK(HRL), 2015 WL 400251, at *8 (N.D. Cal. Jan. 29, 2015).  The same is true for Reis' aiding and abetting claims, *Abu Dhabi Commercial Bank v. Morgan Stanley & Co. Inc.*, 651 F. Supp. 2d 155, 173-74 (S.D.N.Y. 2009) ("For claims of aiding and abetting to survive a motion to dismiss, they must be pled with some level of specificity and may not consist solely of a broad, conclusory, repetition of the elements of aiding and abetting."), and its claims for contributory and vicarious copyright infringement.  *Montalvo v. LT's Benjamin Records, Inc.*, 56 F. Supp. 3d 121, 134 (D.P.R. 2014) (dismissing claims that "merely recite the elements of [contributory and

vicarious] copyright infringement claim[s]).  Reis sets forth zero facts that could support its secondary liability claims against Rialto New York.  Instead, Reis seeks to create claims out of thin air by simply parroting the elements of their causes of action.  For this reason alone, Counts II, III, IV, VIII, X, XII, XIV should be dismissed.

## III.    REIS FAILS TO STATE ANY CLAIMS AGAINST LENNAR CORPORATION.

Reis' claims arise out of two types of unauthorized use: (1) the alleged unauthorized use of Mr. Lederman's login credentials and (2) the alleged unauthorized use of Rialto New York's login credentials by "Doe Unauthorized Users."  Reis sets forth no factual basis for imposing liability on Lennar for any of these alleged violations.  Reis alleges only that Mr. Lederman is employed by Rialto, a subsidiary of Lennar Corporation.  (Compl. ¶¶ 4, 11.)  It is well-understood that "a parent company is not liable for the acts of its subsidiaries simply because it owns the subsidiary's stock."  *In re S. African Apartheid Litig.*, 633 F. Supp. 2d 117, 123 (S.D.N.Y. 2009) (dismissing complaint for failing to allege facts that "sufficiently tie" unlawful activities to the parent company).  Reis has alleged no facts connecting Lennar to any of the purported unlawful conduct set forth in its Complaint.  The mere fact that Rialto is a Lennar subsidiary is not enough.  Reis' claims against Lennar should be dismissed.

## <u>CONCLUSION</u>

For the reasons set forth herein, Defendants respectfully request that the Court grant this motion and dismiss the Complaint.

25

Dated: New York, New York
      November 25, 2015

Kirkland & Ellis LLP

*/s/ Eric F. Leon, P.C.*
Eric F. Leon, P.C.
Kuangyan Huang
KIRKLAND & ELLIS LLP
601 Lexington Avenue
New York, New York 10022
Telephone: (212) 446-4800
Facsimile: (212) 446-4900

*Attorneys for Defendants Lennar Corp.,*
*Rialto Capital Management, LLC, Rialto*
*Capital Advisors of New York, LLC*