**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

REIS, INC. and REIS SERVICES, LLC,　　　　:

　　　　　　　　　　　　　:

　　　　　　　　Plaintiffs,　　:

　　　　-against-　　　　　　:

　　　　　　　　　　　　　:

LENNAR    CORP.,    RIALTO    CAPITAL:
MANAGEMENT, LLC, and RIALTO CAPITAL:
ADVISORS OF NEW YORK, LLC,　　　:

　　　　　　　　　　　　　:

　　　　　　　　Defendants.　　:

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

MEMORANDUM DECISION
AND ORDER

15 Civ. 7905 (GBD)

**GEORGE B. DANIELS, United States District Judge:**

Plaintiffs Reis, Inc. and Reis Services, LLC (together "Reis") bring this action against Defendants Lennar Corporation ("Lennar"), Rialto Capital Management, LLC ("Rialto"), and Rialto Capital Advisors of New York, LLC ("Rialto NY") under the Computer Fraud and Abuse Act ("CFAA"), 18 U.S.C. § 1030; the Copyright Act, 17 U.S.C. § 101, *et seq.* (Compl., ECF No. 1, ¶¶ 41-90.) Plaintiffs also bring common law claims for fraud, breach of contract, conversion, theft, misappropriation, unjust enrichment, and quantum meruit, as well as civil conspiracy and/or aiding and abetting claims based on the above predicate causes of action. (*Id.* ¶¶ 91-171.)

This action arises out of two separate sets of alleged data piracy by Defendants. The first involves a Rialto employee's unauthorized use of Plaintiffs' proprietary database to allegedly download approximately $1.6 million worth of real estate market analysis reports at the behest of Lennar and its subsidiary, Rialto. (*Id.* ¶¶ 4-5, 11, 31-35.) The second involves about $277,000 of reports downloaded between May 2013 and August 2015 by two unknown IP addresses using the credentials of database subscriber Rialto NY, another subsidiary of Lennar. (*Id.*, ¶¶ 6–7, 12, 36–37.) Plaintiffs seek, *inter alia*, payment of compensatory, statutory, and punitive damages, attorney's fees and expenses, as well as any other "just and proper" relief. (*Id.*, at 29.)

Defendants move to dismiss the Complaint for failure to state a claim pursuant to Federal Rule of Civil Procedure 12(b)(6).  (Mot. to Dismiss, ECF No. 17; Defs.' Mem. in Supp. of Mot. to Dismiss ("Mem."), ECF No. 18, at 1.)

Defendants' motion to dismiss Plaintiffs' claims under the CFAA and for secondary federal copyright infringement is GRANTED.   This Court declines to exercise supplemental jurisdiction over Plaintiffs' remaining state law claims.

## I.   FACTUAL BACKGROUND AND PROCEDURAL HISTORY

Defendant Lennar is a Delaware corporation based in Florida with a focus on building single-family homes throughout the United States.  (Mem., at 2.)  Defendant Rialto, an "indirect subsidiary of Lennar," is a real estate investment and asset management company headquartered in Florida.  (Compl. ¶ 11; Mem., at 2.)  Defendant Rialto NY is "an investment adviser firm and is also a subsidiary of Lennar."  (Mem., at 3; *see also* Compl. ¶ 12.)

Plaintiffs are proprietors of a database containing detailed commercial real estate market information encompassing 275 of the largest metropolitan markets in the United States.  (Compl. ¶¶ 2, 19-20.)   Plaintiffs compile and sell this data to real estate professionals in the form of subscription plans or individual reports that "quantify and assess the risks of default and loss associated with mortgages, properties, portfolios, and real-estate-backed-securities."  (*Id.* ¶¶ 2-3, 16-17.)  Plaintiffs own copyrights in a number of their reports, and those copyrights are registered with the United States Copyright Office.  (*See id.* ¶¶ 24-25; *id.*, Ex. A ("List of Copyrighted Reports").)

There are various subscription levels to the database, priced according to the amount of data purchased, number of licenses associated with a subscription, and frequency of its access by subscribers.  (*Id.* ¶ 20.)  According to Plaintiffs, since "[m]ost professional real estate investors do

not want to devote the resources to creating an in-house infrastructure capable of performing [Reis'] work," those investors subscribe to Reis' services. (*Id.* ¶ 17.) Plaintiffs also contend that because the information in these reports is highly valuable, the database has become a target for data pirates[1] and others who wish to benefit from this data without paying. (*Id.* ¶ 3.)

Plaintiffs allege that they protect their database with a firewall that requires secure passwords tailored to the level of access a subscriber has purchased. (*Id.* ¶ 25.) "To protect its proprietary rights, Reis also relies on, among other things, restrictive license agreements" that allow a company to purchase licenses for "an agreed number of employees or other users associated with the company." (*Id.* ¶¶ 25-26.) Each employee receives her own login credentials— a unique username and password—to access the database. (*Id.* ¶ 26.)

According to Plaintiffs, users may not share passwords with anyone, not even colleagues who work for the same subscriber. (*Id.*, ¶ 27.) Once employment with a subscriber ends, a person may not take their credentials with them to use at her new employment. (*Id.*) Specifically, Reis' Terms of Service ("TOS") and its subscriber agreements "explicitly prohibit its licensees to 'resell or transfer . . . use of or access to' the Reis Database." (*Id.*) The TOS also states that "'[t]ransfer or assignment of your password and user name to another individual is strictly prohibited.'" (*Id.*; Decl. of Kuangyan Huang in Supp. of Defs.' Mot. to Dismiss ("Huang Decl."), ECF No. 20, Ex. A, at 2.) Plaintiffs maintain the TOS, as well as the Anti-Piracy Policy, is "prominently displayed" on the database sign-in page under the heading "LEGAL" to provide users with notice that they are legally bound when they agree to use the service. (*Id.* ¶ 30.)

---

[1] Reis' Anti-Piracy Policy defines piracy as "using our service without a license to do so, enabling or trying to enable a third party who is not authorized to use our service to use our service, or exceeding the scope of uses permitted [to] you under a license agreement between you and Reis." (Compl. ¶ 29.)

Plaintiffs further allege that they started a general ongoing investigation of suspicious access patterns as early as June 2014. (*See id.* ¶¶ 49, 54.) According to Plaintiffs, their Compliance Group, which "investigates unusual patterns of use and other signs of possible [data] theft[,]" (*id.* ¶ 33), discovered the first instance of unauthorized usage on which they base their claims against Rialto and Lennar in June 2015. (*Id.* ¶¶ 3, 33.) Specifically, Plaintiffs contend that between December 2009 and October 2010, a Rialto employee, Harvey Lederman, used Reis database credentials issued by his previous employer, GE Capital (who is not a party to this action), to log in 871 times and download 4,548 Reis reports (with an alleged retail value of $1,629,948[2]) "in support of Lennar and Rialto's business." (*Id.* ¶¶ 4, 32.)     Plaintiffs allege that during this timeframe, "Lennar was in the process of launching Rialto" and announced that the 2010 fourth quarter and fiscal year was marked by the "first closing of our Rialto real estate investment fund with initial equity commitments of approximately $300 million (including $75 million committed by us)." (*Id.* ¶ 34.) According to Plaintiffs, neither Rialto nor Lennar had legitimate access to the Reis database until Rialto NY purchased a subscription in November 2010—about a month after Lederman stopped downloading reports with his GE Capital-issued credentials. (*Id.* ¶ 35.) Therefore, Plaintiffs allege that Rialto and Lennar's intrusion into the database using Mr. Lederman's GE Capital credentials was "knowing and willful because Defendants and their employees knew that Lennar and Rialto were not authorized licensees of Reis . . . [and] knew that Lennar and Rialto had not paid for access to the Reis Database . . . ." (*Id.* ¶ 38.)

Plaintiffs contend that their June 2015 discovery of the allegedly illegal usage led them to more closely investigate the database usage associated with Rialto NY's credentials. (*Id.* ¶ 6.)

---

[2] According to Plaintiffs, the alleged loss of approximately $1.6 million is based on the individual retail value of each of the 4,548 reports if those reports were downloaded without a subscription. (*See* March 31, 2016 Oral Arg. Tr. ("Tr."), at 76:10-77:11.)

According to Plaintiffs, this investigation revealed a second act of alleged piracy, this time by unidentified individuals from two IP addresses—67.136.101.2 and 173.11.106.97—who accessed the database through Rialto NY's credentials.  (*Id.*)  These unknown users used Rialto NY's credentials "to download at least 747 proprietary Reis reports," worth $277,412 in retail value and some in which Plaintiffs own copyrights, between May 2013 and August 2015.  (*Id.* ¶ 36.) Plaintiffs therefore allege that Lennar, Rialto, and Rialto NY all "knew that the unidentified users with whom [Rialto NY] shared its credentials were not authorized licensees of Reis . . . [,]" in violation of Rialto NY's contract with Plaintiffs, as well as Plaintiffs' Terms of Service. (*Id.* ¶¶ 7, 38-39.)

## II.   **LEGAL STANDARD**

To survive a motion to dismiss, "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'"  *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)).  The plaintiff must demonstrate "more than a sheer possibility that a defendant has acted unlawfully"; stating a facially plausible claim requires pleading facts that enable the court "to draw the reasonable inference that the defendant is liable for the misconduct alleged."  *Iqbal*, 556 U.S. at 678.  Thus, the factual allegations pleaded "must be enough to raise a right to relief above the speculative level."  *Twombly*, 550 U.S. at 555.

A district court must first review a plaintiff's complaint to identify allegations that, "because they are no more than conclusions, are not entitled to the assumption of truth."  *Iqbal*, 556 U.S. at 679.  The court then considers whether Plaintiff's remaining well-pleaded factual allegations, assumed to be true, "plausibly give rise to an entitlement to relief."  *Id.*; *see also Targum v. Citrin Cooperman & Co., LLP*, No. 12 CIV. 6909, 2013 WL 6087400, at *3 (S.D.N.Y.

Nov. 19, 2013).   In deciding the 12(b)(6) motion, the court accepts the complaint's well-pleaded factual allegations as true and draws all reasonable inferences in the non-moving party's favor. *See N.J. Carpenters Health Fund v. Royal Bank of Scotland Grp., PLC*, 709 F.3d 109, 119 (2d Cir. 2013).

"In deciding a motion to dismiss under Rule 12(b)(6), the court may refer 'to documents attached to the complaint as an exhibit or incorporated in it by reference, to matters of which judicial notice may be taken, or to documents either in plaintiffs' possession or of which plaintiffs had knowledge and relied on in bringing suit.'" *Fishbein v. Miranda,* 670 F. Supp. 2d 264, 271 (S.D.N.Y. 2009), *aff'd sub nom. Silverman v. Teamsters Local 210 Affiliated Health & Ins. Fund*, 761 F.3d 277 (2d Cir. 2014) (quoting *Brass v. Am. Film Tech., Inc.*, 987 F.2d 142, 150 (2d Cir. 1993)); *see also Hayes v. Coughlin,* No. 87 Civ. 7401, 1991 WL 220963, at *1 (S.D.N.Y. Oct. 16, 1991) ("Papers outside a complaint may be incorporated by reference into the complaint when such papers are referred to within the body of the complaint.").

## III.   SECONDARY COPYRIGHT INFRINGEMENT CLAIMS

In Counts III and IV, Plaintiffs allege contributory and vicarious copyright infringement claims against Rialto NY under the Copyright Act, 17 U.S.C. § 101, *et seq*, based on the second alleged incidence of data piracy from May 2013 and August 2015.   (*See* Compl. ¶ 36.) Specifically, Plaintiffs claim that Rialto NY knowingly shared valid Reis login credentials in violation of its subscription agreement with the Unauthorized Doe Users, who used those credentials to download "at least 747 proprietary Reis reports having a retail value of $277,412," including the nine reports to which Plaintiffs hold the copyrights. (Compl., ¶¶ 7, 24, 76-90.)

To withstand Defendants' motion to dismiss, Plaintiffs must "plead[] factual content" for each element of the claim asserted such that "the court [can] draw the reasonable inference that

the defendant is liable for the misconduct alleged." *Iqbal*, 556 U.S. at 678. "Neither contributory nor vicarious copyright infringement can exist without an underlying finding of direct infringement." *Alexander v. Murdoch*, No. 10 CIV. 5613, 2011 WL 2802899, at *17 (S.D.N.Y. May 27, 2011) (dismissing claims for contributory and vicarious copyright infringement where plaintiff failed to allege direct infringement); *see also*, *Metro-Goldwyn-Mayer Studios Inc. v. Grokster, Ltd.*, 545 U.S. 913, 930 (2005) ("One infringes contributorily by intentionally inducing or encouraging direct infringement . . . and infringes vicariously by profiting from direct infringement while declining to exercise a right to stop or limit it . . . .") (internal citations omitted); *Faulkner v. Nat'l Geographic Enters. Inc.*, 409 F.3d 26, 40 (2d Cir. 2005) ("[T]here can be no contributory infringement absent actual infringement.").

Defendants argue that because "Reis cannot credibly allege that the 'unknown' 'DOE' users were also 'unauthorized,' there is no primary violation of the law here." (Mem. at 24.)  The Complaint offers no information or facts alleging that the Doe Users were primary infringers on which to base the secondary infringement claims Plaintiffs bring against Rialto NY.  *See Patrick Collins, Inc. v. John Doe 1*, 945 F. Supp. 2d 367, 375 (E.D.N.Y. 2013) (finding that plaintiff had "adequately pled a plausible claim of *primary* copyright infringement by providing sufficient detail" of defendant's infringing conduct) (emphasis added) (citing *John Wiley & Sons, Inc. v. Doe Nos. 1-30*, 284 F.R.D. 185, 189 (S.D.N.Y. 2012)).  Indeed, Plaintiffs do not bring any primary copyright infringement claims against any Defendant.  (*See* Compl. ¶¶ 76-90.)

Without alleging a primary copyright infringement, Plaintiffs claims for secondary infringement are deficient. *See Faulkner*, 409 F.3d 40; *Wolk v. Kodak Imaging Network, Inc.*, 840 F. Supp. 2d 724, 750 (S.D.N.Y. 2012) ("[I]n order to hold a defendant secondarily liable someone else must have directly infringed on the copyright holder's rights."); *Matthew Bender & Co. v.*

7

*West Publ'g Co.*, 158 F.3d 693, 706 (2d Cir. 1998) (same) (internal citations omitted). Furthermore, as Defendants state in their Reply brief, Reis has not responded to Defendants' arguments regarding secondary copyright infringement. (Reply, at 10.)  As Plaintiffs have failed to sufficiently allege secondary copyright infringement claims against Defendants, Defendants' motion to dismiss is granted as to Counts III and IV.

### IV.    CFAA CLAIMS

The CFAA is a criminal statute that penalizes unauthorized access to protected computers with intent to defraud or cause damage. *See* 18 U.S.C. § 1030(a). The text of the civil enforcement provision, § 1030(g), provides:

> Any person who suffers damage or loss by reason of a violation of this section may maintain a civil action against the violator to obtain compensatory damages and injunctive relief or other equitable relief. A civil action for a violation of this section may be brought only if the conduct involves 1 of the factors set forth in subclause[] (I), (II), (III), (IV), or (V) of subsection (c)(4)(A) (i).  Damages for a violation involving only conduct described in subsection (c)(4)(A)(i)(I) are limited to economic damages . . . .

18 U.S.C. § 1030(g).  The only potential basis for liability in this case on the facts as Plaintiffs allege is subclause (I), which provides that an action may be brought if a plaintiff alleges a "loss to 1 or more persons during any 1-year period . . . aggregating at least $5,000 in value." 18 U.S.C. § 1030(c)(4)(A)(i)(I).  Therefore, to state a claim for loss in excess of $5,000, Plaintiffs must plead that Defendants: "(1) accessed a 'protected computer'; (2) 'without any authorization or exceeding its authorized access'; and (3) caused 'loss' in excess of $5,000."  *Liveperson, Inc. v. 24/7 Customer, Inc.*, 83 F. Supp. 3d 501, 511 (S.D.N.Y. 2015) (citing 18 U.S.C. § 1030(g) *referencing* 18 U.S.C. § 1030(a)(2) *and* § 1030(a)(5)).

As the parties do not dispute the first two elements—that the Reis database is a "protected computer" as defined by the statute and that, at minimum, Lederman exceeded his authorized

access—the dispositive issue is whether Plaintiffs have alleged facts that allow them to meet jurisdictional threshold of $5,000 of either damage or loss. *See Nexans Wires S.A. v. Sark-USA, Inc.* ("*Nexans I*"), 319 F. Supp. 2d 468, 472 (S.D.N.Y. 2004) (citing *Theofel v. Farey-Jones*, 341 F.3d 978, 986 n. 5 (9th Cir. 2003) *amended by* 359 F.3d 1066 (9th Cir. 2004)), *aff'd*, *Nexans Wires S.A. v. Sark-USA, Inc.* ("*Nexans II*"), 166 F. App'x 559 (2d Cir. 2006).

18 U.S.C. § 1030(e)(8) defines "damage" as "any impairment to the integrity or availability of data, a program, a system, or information," and "loss" as:

> [a]ny reasonable cost to any victim, including the cost of responding to an offense, conducting a damage assessment, and restoring the data, program, system, or information to its condition prior to the offense, and any revenue lost, cost incurred, or other consequential damages incurred because of interruption of service.

18 U.S.C. § 1030(e)(11).  "Both loss and damage must relate to the victim's computer systems." *Liveperson*, 83 F. Supp. 3d at 514 (citing *Nexans I*, 319 F. Supp. 2d at 477; *Civic Ctr. Motors, Ltd. v. Mason St. Imp. Cars, Ltd.*, 387 F. Supp. 2d 378, 381-82 (S.D.N.Y. 2005).  This means that Plaintiffs "must establish that the Defendant[s] intended to impair the [plaintiffs'] service." *In re iPhone Application Litig.*, 844 F. Supp. 2d 1040, 1067 (N.D. Cal. 2012) (citing *Czech v. Wall Street on Demand, Inc.*, 674 F. Supp. 2d 1102, 1115 (D. Minn. 2009)).

The losses Plaintiffs have alleged are (1) lost retail value of the reports and (2) losses related the development of their investigatory software and its deployment during 2014 and 2015 to identify database piracy.  (Compl., ¶¶ 47, 49, 54-55.)  Defendants correctly contend that Plaintiffs have failed to state a claim under the CFAA because Plaintiff have not adequately alleged loss cognizable under the CFAA.  (Mem. at 8, 11.)

As to the first type of loss alleged, Plaintiffs' "lost retail value" of about $1,629,948, (Compl. ¶ 55), from downloaded reports is not a loss covered by the CFAA. *See Schatzki v. Weiser*

*Capital Mgmt., LLC*, No. 10 Civ. 4685, 2012 WL 2568973, at *3 (S.D.N.Y. Jul. 3, 2012) ("'Loss'

is interpreted narrowly, however, and it 'includes only costs actually related to computers.'")

(quoting *Garland-Sash v. Lewis*, No. 05 Civ. 6827, 2011 WL 6188712, at *4 (S.D.N.Y. Dec. 6,

2011)); (*see* Mem. at 8; Compl. ¶ 45); *see also Orbit One Commc'ns, Inc. v. Numerex Corp.*, 692

F. Supp. 2d 373, 386 (S. D. N. Y. 2010) (concluding that the CFAA does not apply to a competitive

injury arising from misappropriated information, but only for damage to a computing system).

    With regard to the expenditures of "at least $5,000 in value," (Compl. ¶ 47)  related to

investigating unauthorized access to the database, Plaintiffs allege the following:

> 49. As part of the on-going investigation of Defendants' access and use of the Reis
> Database, Reis developed its own proprietary investigatory software at a cost of
> $76,364 in hourly wages of Reis developers from June 2014 through May
> 2015 . . . .
>
> 54. In addition, Reis's Vice President of Product Development and Intellectual
> Property spent on average $4,900 per month of time in 2014 and 2015 using this
> investigatory software tool to identify piracy.  The value of the Reis employees'
> time in investigating the Defendants' access and use of Reis's computer system
> exceeded $5,000 in one calendar year.

(Compl. ¶¶ 49, 54.)

    While the CFAA defines loss as "[a]ny reasonable cost" such as the "cost of responding to

an offense, conducting a damage assessment, and restoring the data, program, system, or

information to its condition prior to the offense," Plaintiffs' allegations that they engaged in "an

investigation into the intrusion and a damages assessment" do not meet the 12(b)(6) standard for

two reasons.  18 U.S.C. § 1030(e)(11). First, Plaintiffs fail to allege that they sought to "restor[e]

the data, program, system or information to its condition prior to the offense[,]" as required by

courts in this Circuit. *See, e.g., Fink v. Time Warner Cable*, 810 F. Supp. 2d 633, 641 (S.D.N.Y.

2011) (holding that "losses relating to time and effort in assessing 'damage' to each computer

whose transmissions were interrupted" are outside of those contemplated by the scope of the

CFAA because the plaintiffs did not allege "that they needed to *restore*[] . . . data, [a] program, [a] system, or information *to its condition prior to Defendant's conduct*") (emphasis added) (internal quotation marks and citation omitted).   Plaintiffs merely allege that that the purpose of its investigations were to "identify piracy," (*see* Comp. ¶ 54), by "identify[ing] suspicious patterns of usage" and "determin[ing] whether the usage is licensed or not."  (*Id.* ¶¶ 51-52.)   It is true that "physical damage to a computer is not necessary to allege damage or loss," *Bose v. Interclick, Inc.*, No. 10 Civ. 9183, 2011 WL 4343517 (S.D.N.Y. Aug. 17, 2011) (internal citation omitted), nor is loss "lessened merely because fortuitously no physical damage was allegedly caused to the computer system or software." *Kaufman v. Nest Seekers, LLC*, No. 05 CV 6782, 2006 WL 2807177 (S.D.N.Y. Sept. 26, 2006) (internal citation omitted).  However, in this case, Plaintiffs make no allegations that the investigation was for the purpose of looking into any damage to data, programs, or server system, other than the conclusory statement that they "expend[ed] time, money, and resources (aggregating at least $5,000 in value) to conduct an investigation into the intrusion and a damages assessment."  (Compl. ¶ 47.)

Second, the case law in this Circuit "requires a cost constituting a loss to be directed in some way at the effects of the prior intrusion, not at those of some potential future offense."  *See Int'l Chauffeured Serv., Inc. v. Fast Operating Corp.*, No. 11 Civ. 2662, 2012 WL 1279825, at *4 (S.D.N.Y. Apr. 16, 2012) (citing *Univ. Sports Publ'ns Co. v. Playmakers Media Co.*, 725 F. Supp. 2d 378, 388 (S.D.N.Y. 2010) (internal citation omitted)).  According to Plaintiffs' allegations, Reis "discovered the unauthorized usage that forms the basis of Reis' claims against Lennar and Rialto in June 2015."  (*See* Compl. ¶¶ 3, 33.)  However, fatal to Plaintiff's complaint is that Reis spent the $76,364 of hourly wage time developing "proprietary investigatory software" from June 2014 to May 2015 before Plaintiffs discovered Defendants alleged unauthorized usage.  (*See* Comp., ¶

49.)  Indeed, Plaintiffs conceded as much at the March 31, 2016 oral argument.  (*See* Oral Arg. Tr., 70:20-71:2.[3])  The CFAA permits recovery only for "expenses incurred 'to identify and address damage caused by the security breach that had already taken place,'" not prophylactic costs.  *Cohen v. Gerson Lehrman Grp., Inc.*, No. 09 Civ. 4352, 2011 WL 4336683, at *8 (S.D.N.Y. Sept. 15, 2011) (quoting *University Sports Publ'g Co. v. Playmakers Media Co.*, 725 F. Supp. 2d 378, 388 (S.D.N.Y. 2010)).

Furthermore, Plaintiffs do not specify which portion of any investigatory expenses resulted from Defendants' conduct.  *See Liveperson*, 83 F. Supp. 3d at 514 ("The former does not specify what portion of the over $75,000 in damages constitute either loss or damage under the Act, i.e. whether $5,000 or more of the damages alleged are attributable to the CFAA claim.").  Plaintiffs merely allege that "Reis's Vice President of Product Development and Intellectual Property spent on average $4,900 per month of time in *2014 and 2015* using this investigatory software tool to identify piracy." (Compl. ¶ 54) (emphasis added).  The bald assertion that "the value of the Reis employee's time in investigating the Defendants' access and use of Reis's computer system exceeded $5,000 in one calendar year," (*id.*), in a calendar year where there were presumably other purported data pirates, fails to allege which portion of these expenses were specifically due to Defendants' access.  *See Liveperson*, 83 F. Supp. 3d at 514.   Plaintiffs have therefore failed to allege that they have met the $5,000 jurisdictional threshold required to state a claim under the CFAA.

---

[3] Specifically, Plaintiff admitted the following:
> Mr. Fischer: . . . [W]e have developed a software because multiple users are misusing our service.
> The Court: That is a decision you made before you even found out about this defendant.
> Mr. Fischer: Correct.  To the extent that temporal issue is the key . . . .

(Tr., at 70:20-71:2.)

As Plaintiffs failed to state a claim under the CFAA, Plaintiffs' conclusory statements that purport to allege Defendants' participation in a conspiracy to violate the CFAA also fail. *See NetApp, Inc. v. Nimble Storage, Inc.*, 41 F. Supp. 3d 816, 836 (N.D. Cal. 2014); *PNC Mortgage v. Superior Mortgage Corp.*, CIV. A. NO. 09-5084, 2012 WL 627995, at *4 (E.D. Pa. Feb. 27, 2012); (Compl. ¶ 64).

Defendants' motion to dismiss the primary and secondary CFAA claims is GRANTED.

## V.   STATE LAW CLAIMS

Having dismissed all claims over which it had original jurisdiction, this Court declines to exercise supplemental jurisdiction over the remaining state law claims at this early stage in the litigation. *See* 28 U.S.C. § 1367(c)(3) ("The district courts may decline to exercise supplemental jurisdiction over a claim . . . [if] the district court has dismissed all claims over which it has original jurisdiction."); *Purgess v. Sharrock*, 33 F.3d 134, 138 (2d Cir. 1994) ("[T]he exercise of supplemental jurisdiction is left to the discretion of the district court . . . .") (citation omitted).

## VI.   CONCLUSION

Defendant's Motion to Dismiss for failure to state a claim is GRANTED as to Plaintiffs' CFAA and secondary federal copyright claims. This court declines to exercise supplemental jurisdiction over plaintiffs' state law claims.

The Clerk of Court is directed to close the motion at ECF No. 17 and this case.

Dated: New York, New York
       July 5, 2016

SO ORDERED.

GEORGE B. DANIELS
United States District Judge

13